Karen C. HERZOG, an individual, Plaintiff-Appellant,

v.

CASTLE ROCK ENTERTAINMENT, a California partnership, et al., Defendants-Appellees.

No. 98-5651.

United States Court of Appeals,

Eleventh Circuit.

Oct. 27, 1999.

Appeal from the United States District Court for the Southern District of Florida. (No. 97-505-CV-DMM), Donald M. Middlebrooks, Judge.

Before BIRCH and MARCUS, Circuit Judges, and MILLS[*], Senior District Judge.

PER CURIAM:

Based on the well-reasoned district court opinion, we AFFIRM. A copy of the opinion is annexed

hereto.


APPENDIX

KAREN C. HERZOG, an individual, Plaintiff,

vs.

CASTLE ROCK ENTERTAINMENT, a California partnership, RIO DULCE INC., a New York corporation, and JOHN SAYLES, individually, Defendants.

CASE NO. 97-505-CIV-MIDDLEBROOKS

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

Sept. 29, 1998.

MIDDLEBROOKS, District Judge:

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

[*]Honorable Richard Mills, Senior U.S. District Judge for the Central District of Illinois, sitting by designation.

THIS CAUSE came before the Court upon Defendants' Motion for Summary Judgment. Plaintiff filed this action against Defendants for copyright infringement under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.,* alleging that Defendants infringed her copyright in her screenplay, "Concealed." The allegedly infringing work is "Lone Star," a motion picture written and directed by Defendant John Sayles, produced by Defendant Rio Dulce Inc., and financed by Defendant Castle Rock Entertainment. Plaintiff is seeking actual or statutory damages, punitive damages, attorney's fees, costs, and equitable relief.

Defendants' Motion for Summary Judgment was filed February 20, 1998, on the grounds that Plaintiff cannot raise a genuine issue of material fact as to Defendants' access to "Concealed" or substantial similarity of protected expression between "Concealed" and "Lone Star," and Defendants are therefore entitled to summary judgment as a matter of law. Plaintiff filed a response, to which Defendants replied; Plaintiff surreplied on May 19, 1998. The Court heard oral argument on September 1, 1998. Based upon the arguments of the parties and a thorough review of the record, Defendants' Motion for Summary Judgment (DE 69) is GRANTED, for the reasons fully explained below.

FACTS

Plaintiff Karen C. Herzog ("Herzog") is a teacher of cinematography, history of film and television production at Braddock Senior High School in Miami, Florida. In the fall of 1991, she was a student in the Master of Fine Arts (M.F.A.) program at the University of Miami in Coral Gables, Florida. To obtain a Master of Fine Arts Degree in Film from the University of Miami, Ms. Herzog was required to write a feature length screenplay under the supervision of a thesis committee comprised of three professors. Her initial thesis committee members were Janet Bohak, William Rothman and Peter Zorn.

In 1992, Ms. Bohak left the University of Miami and Ms. Herzog was required to find a replacement member of the thesis committee. She approached William Cosford, an adjunct professor within the Department, gave him a copy of "Concealed" and asked him if he would serve on her committee. According to Ms. Herzog, Mr. Cosford, who was also a film critic for *The Miami Herald,* advised her that he did not

2

have time to serve on the committee, but he did not return the copy of her screenplay she had given him. Mr. Cosford died in January 1994.

Ms. Herzog then approached Stephen Bowles, who agreed to serve on her committee. Professor Bowles teaches film history, theory, criticism, and script writing at the University of Miami. Ms. Herzog also alleges that she gave "Concealed" to Scott Manders, a fellow student, for his critique prior to her submission of the screenplay to the committee.

In April 1993, Plaintiff deposited and registered her screenplay entitled "Concealed" with the Writer's Guild of America ("WGA"). "Concealed" was also deposited and registered with the United States Copyright Office. Certificate of Registration No. Pau-2-113-247 was obtained on September 6, 1996.

Plaintiff does not allege that she ever submitted "Concealed" to Mr. Sayles or to any other Defendant. Instead, she alleges that Mr. Sayles gained access to "Concealed" through the late William Cosford, Scott Manders, and/or the members of her thesis committee, Stephen Bowles, William Rothman, and Peter Zorn.

Defendant John Sayles ("Sayles") is a critically acclaimed screenwriter and director. In late 1994/early 1995, Mr. Sayles wrote the screenplay for "Lone Star"[1]; he also directed the motion picture, which was released in 1996. The "Lone Star" screenplay was nominated for an Academy Award in 1996.

In February 1993, Mr. Sayles came to Miami for the screening of his film "Passion Fish" at the Miami Film Festival ("Festival"). Plaintiff alleges that while Mr. Sayles was in Miami for the Festival, he socialized with Mr. Cosford, Mr. Manders and/or members of her thesis committee, specifically, Mr. Bowles, and thereby gained access to "Concealed."

In his Affidavit, Mr. Sayles states that prior to the commencement of this lawsuit, he had never met nor heard of Karen Herzog or Scott Manders; that he has never seen any screenplay entitled "Concealed,"

---

[1] On March 7, 1995, Rio Dulce was granted Certificate of Registration No. Pau-965-443 for "Lone Star." This registration names Mr. Sayles as the author of the screenplay for which federal copyright protection was sought and recites that Mr. Sayles wrote the screenplay. In June 1995, Rio Dulce assigned its rights to Castle Rock. In June 1996, Castle Rock released and distributed "Lone Star," the film, throughout the United States. Plaintiff asserts that Castle Rock has filed a federal copyright application for the film "Lone Star," based upon the "Lone Star" screenplay, which identifies Mr. Sayles as the author.

3

nor has he ever seen any work purporting to have been authored by Ms. Herzog. He states that Mr. Cosford never had any creative input to any of his works. Mr. Sayles believes the last time he saw Mr. Cosford was in 1991 in New Jersey; that although he had visited with Mr. Cosford a few times in Miami, he does not recall seeing him at the 1993 Miami Film Festival; that if he socialized with Mr. Cosford at that time, Mr. Cosford did not deliver any screenplays to him, nor did he review any screenplays. Mr. Sayles states that he was solely responsible for the conception, creation and development of "Lone Star."[2]

At deposition, Mr. Bowles stated that he never saw Mr. Sayles during the 1993 Miami Film Festival. According to Ms. Herzog's own testimony at deposition, Mr. Manders also denies seeing Mr. Sayles during the Festival.

Plaintiff describes "Concealed" as follows:

"Concealed" tells the story of a small, rural Southern town and the hidden interrelationships and long-buried secrets of its residents. It begins as Marty, a former big-city police detective, returns to her hometown after sustaining emotional and physical injuries and is coerced into joining the sheriff's department. Marty begins an inquiry into the apparently natural death of a prominent citizen. Her investigation develops into a multiple murder investigation in which she uncovers the town's murderous past and her own family's part therein. In the course of the investigation, Marty is forced to deal with her town's history of simmering racial and ethnic tension and must confront the legacy of her own father's actions as sheriff. She discovers painful secrets from her own past, as well as that of some of the town's other residents—including the descendants of the area's black Seminole Indians—all of which have continuing repercussions in the present. The investigation is the thread that weaves these narratives together.

Complaint at 3, ¶ 10.

Defendants describe "Lone Star" as follows:

"Lone Star" is the story of Sam Deeds, the sheriff of Rio County, a sleepy Texas/Mexico border community, who investigates the forty year old murder of Charley Wade, a corrupt and bigoted sheriff of Rio County. Sam comes to believe his late father, Buddy Deeds, himself a former Rio County sheriff, killed Wade. Those who honor Buddy's memory think that Sam's suspicions are groundless and find Sam too ready to suspect Buddy because of Sam's long simmering resentment of Buddy's interference in young Sam's courtship of Pilar. Sam, a man of honor, cannot let the matter rest. He presses his investigation, finding evidence that suggests Buddy was not above profiting from his post and may have had good reason to kill Wade—until Hollis, a former sheriff's deputy, finally

---

[2]Affidavit of John Sayles at 1-2, attached as Exhibit A to Defendants' Motion for Summary Judgment and Incorporated Memorandum of Law.

4

confesses to killing Wade. Convinced that the homicide was justified, Sam agrees to let the matter rest without making public what he has learned.

Against this backdrop, "Lone Star" develops several subplots. Sam's investigation brings him into contact with Pilar and they finally consummate their affair. Afterwards, Sam learns that Pilar is his half-sister, the result of a sexual encounter between Buddy and Pilar's mother. Sam shares this stunning information with Pilar in the film's final scenes, and their decision to continue the relationship despite this knowledge constitutes the film's ultimate resolution. In addition, Sam's investigation reintegrates three generations of black men into a family whole: Otis, an older black man who witnessed Wade's murder and participated in the ensuing coverup; his estranged son, Delmore Payne, the new commander of the nearby Army training installation where Wade's body was found; and Chet, Del's young son. Finally, the film deals with Anglo/African-American/Latino relations as it portrays the sociological forces at work in Rio County, which sits on the border with Mexico, and which houses an Army base with a number of black recruits in residence.

APPENDIX—Continued


Defendants' Motion for Summary Judgment at 2-3.

STANDARD OF REVIEW

The standard to be applied in reviewing summary judgment motions is stated in Rule 56(c) of the

Federal Rules of Civil Procedure:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. The moving party

bears the burden of meeting this standard. *Adickes v. S.H. Kress & Company,* 398 U.S. 144, 90 S.Ct. 1598,

26 L.Ed.2d 142 (1970).

In applying this standard, the Eleventh Circuit has explained:

In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608; *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981). All reasonable doubts about the facts should be resolved in favor of the non-movant. *Casey Enterprises v. Am. Hardware Mutual Ins. Co.,* 655 F.2d 598, 602 (5th Cir.1981). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Marsh,* 651 F.2d at 991; *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.,* 420 F.2d 1211, 1213 (5th Cir.1969). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these

facts. *Id.* at 1213. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Elect. Tech. v. Wackenhut Prot. Systems,* 669 F.2d 1026, 1031 (5th Cir.1982); *Croley v. Matson Navigation Co.,* 434 F.2d 73, 75 (5th Cir.1970).

Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes,* 398 U.S. at 160, 90 S.Ct. at 1609-10; *Marsh,* 651 F.2d at 991. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg,* 370 F.2d 605, 611-12 (5th Cir.1967). *See Dalke v. Upjohn Co.,* 555 F.2d 245, 248-49 (9th Cir.1977).

*Clemons v. Dougherty County,* 684 F.2d 1365, 1368-69 (11th Cir.1982); *see also Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1502 (11th Cir.1985), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986).

The Supreme Court provided significant additional guidance as to the evidentiary standard which trial courts should apply in ruling on a motion for summary judgment:

[The summary judgment] standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Brady v. Southern R. Co.,* 320 U.S. 476, 479-80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943).

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court in *Anderson* further stated that "[t]he mere existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252, 106 S.Ct. 2505. In determining whether this evidentiary threshold has been met, the trial court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Id.* at 253, 106 S.Ct. 2505. If the non-movant in a summary judgment action fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted. *Id.* at 254-55, 106 S.Ct. 2505.

6

In another case, the Supreme Court has declared that a non-moving party's failure to prove an essential element of a claim renders all factual disputes as to that claim immaterial and requires the granting of summary judgment:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment historically has been withheld in copyright cases because courts have been reluctant to make subjective determinations regarding the similarity between two works. *See Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir.) (citing *Arnstein v. Porter,* 154 F.2d 464, 474 (2d Cir.1946)), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). However, non-infringement may be determined as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar. *Beal v. Paramount Pictures Corp.,* 20 F.3d 454 (11th Cir.1994), *cert. denied,* 513 U.S. 1062, 115 S.Ct. 675, 130 L.Ed.2d 607 (1994); *Warner Bros., Inc. v. Am. Broadcasting Cos.,* 720 F.2d 231, 240 (2d Cir.1983) (quoting *Hoehling,* 618 F.2d at 977) (emphasis in original) (citation omitted), *aff'd* 530 F.Supp. 1187 (S.D.N.Y.1982), *after remand,* 654 F.2d 204 (2d Cir.), *aff'g and remanding,* 523 F.Supp. 611 (S.D.N.Y.1981).

It is against this standard that we measure the Defendants' Motion for Summary Judgment.

DISCUSSION

To state a claim for copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel.Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991); *Beal,* 20 F.3d at 459;

7

*BellSouth Advertising & Publishing Corp. v. Donnelley Info. Publishing, Inc.,* 999 F.2d 1436, 1440 (11th Cir.1993) (*en banc* ).  If the plaintiff does not have direct proof of copying, the plaintiff may show copying by demonstrating that the defendants had access to the copyrighted work and that the works are "substantially similar."  *Benson v. Coca-Cola Co.,* 795 F.2d 973, 974 (11th Cir.1986), *reh'g denied,* 801 F.2d 404 (11th Cir.1986) (*en banc* ).  If the plaintiff cannot show access, the plaintiff may still prevail by demonstrating that the works are "strikingly similar."  *Ferguson v. National Broadcasting Co.,* 584 F.2d 111, 113 (5th Cir.1978).[3]

To show substantial similarity, the plaintiff must establish that "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."  *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 829 (11th Cir.1982).

The protection afforded by copyright, however, does not extend to all aspects of an author's work.  "It is an axiom of copyright law that the protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself."  *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976);  *see also* 17 U.S.C. § 102(b);  *Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1880).  The codification of the distinction between idea and expression evinces congressional intent to strike a balance between the competing societal interests of rewarding an individual's creativity and effort while at the same time permitting the nation to enjoy the benefits and progress from the use of the same subject matter.  *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1162 (9th Cir.1977).

Similarly, *scenes a faire,* "sequences of events which necessarily follow from a common theme," are not protectible.  *Reyher,* 533 F.2d at 91.  Incidents, characters, or settings that are indispensable or standard in the treatment of a given topic are not copyrightable.  *See, e.g., Walker v. Time Life Films, Inc.,* 784 F.2d 44, 50 (2d Cir.) (no protection for common elements in police fiction, such as "drunks, prostitutes, vermin

---

[3]Fifth Circuit decisions prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ).

and derelict cars" and "foot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop"), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986); *Evans v. Wallace Berrie & Co.,* 681 F.Supp. 813, 817 (S.D.Fla.1988) ("Such similarities as using a sand dollar as currency, foods made of seaweed, seahorses for transportation and places made of oysters or mother of pearl are not protected similarities of expression, but are more accurately characterizations that naturally follow from the common theme of an underwater civilization").

Thus, in an action for infringement, it must be determined both whether the similarities between the works are substantial from the point of view of the lay reader and whether those similarities involve copyrightable material. In *Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), Judge Learned Hand articulated what has become a guiding principle in this elusive inquiry:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the general statement of what the play is about, and at times consist of only its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which apart from their expression, his property is never extended.

*See also* Z. Chaffee, *Reflections on the Law of Copyright,* 45 Col.L.Rev. 503, 513 (1945) ("protection covers the 'pattern' of the work ... the sequence of events and the development of the interplay of characters"). These controlling principles guide our analysis of the Plaintiff's claims.

A.      Ownership of a Valid Copyright

Plaintiff has submitted a copy of her certificate of copyright registration for "Concealed" as proof of her ownership of a valid copyright for "Concealed";[4] Defendants have not contested, for summary judgment purposes, Plaintiff's ownership of such a copyright.

B.      Copying

---

[4]Complaint, Exhibit B.

Since it is virtually impossible to prove copying directly, this element is usually established circumstantially, by demonstrating that the person who composed the defendant's work had access to the copyrighted material and that there is substantial similarity between the two works. *Beal,* 20 F.3d at 459; *Baxter v. MCA, Inc.,* 812 F.2d 421, 423 (9th Cir.), *cert. denied,* 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987) (these two types of circumstantial evidence of infringement are accepted because direct evidence of copying is rarely available); *see* 3 *Nimmer* § 13.01[B], at 13-10 to -11. Once the plaintiff has made this showing, the burden shifts to the defendant to prove that his/her work was not a copy, but rather was an independent creation. *Kamar International, Inc. v. Russ Berrie and Co.,* 657 F.2d 1059, 1062 (9th Cir. 1981). If the plaintiff cannot show access, the plaintiff may still prevail by demonstrating that the works are so strikingly similar as to preclude the possibility of independent creation. *See* 3 *Nimmer* § Cir.1997). In the case at hand, Plaintiff does not claim, nor would we find, that "Concealed" and "Lone Star" are strikingly similar. Since Plaintiff admittedly has no direct evidence of copying, she must first show that the Defendants had access to "Concealed" and substantial similarity between the two works. *Beal,* 20 F.3d at 459.

1.    Access

Just as it is virtually impossible to offer direct proof of copying, so is it often impossible for a plaintiff to offer direct evidence that defendant actually viewed or had knowledge of plaintiff's work. Nonetheless, some courts have defined access as the actual viewing and knowledge of plaintiff's work by the defendant.[5] This circuit, however, regards a "reasonable opportunity to view" as access. *Ferguson,* 584 F.2d at 113.

Plaintiff attempts to establish that Mr. Sayles had a reasonable opportunity to view "Concealed" based on two facts: (1) that she delivered a copy of "Concealed" to Mr. Cosford, Mr. Manders, and her thesis

---

[5]*Schwarz v. Universal Pictures Co.,* 85 F.Supp. 270 (S.D.Cal.1945); *Christie v. Harris,* 47 F.Supp. 39 (S.D.N.Y.1942), *aff'd,* 154 F.2d 827 (2d Cir.1946), *cert denied.* 329 U.S. 734, 67 S.Ct. 97, 91 L.Ed. 634 (1946); *Cantor v. Mankiewicz,* 203 N.Y.S.2d 626 (Sup.Ct. N.Y.Court 1960); *Bradbury v. Columbia Broadcasting Sys., Inc.,* 287 F.2d 478 (9th Cir.1961) (this definition was apparently stipulated by both parties in *Bradbury* ), *cert. dismissed,* 368 U.S. 801, 82 S.Ct. 19, 7 L.Ed.2d 15 (1961); *Roberts v. Dahl,* 168 U.S.P.Q. 428, 1971 WL 16617 (Ill.Cir.Ct.1971), *aff'd,* 6 Ill.App.3d 395, 286 N.E.2d 51, 174 U.S.P.Q. 517 (1972).

committee and (2) that Mr. Cosford, Mr. Manders, members of her committee and Mr. Sayles attended the 1993 Miami Film Festival. Plaintiff contends that based on these facts, these individuals could have given Mr. Sayles access to "Concealed."

Except for inadmissible hearsay, which is addressed below, Plaintiff has no evidence Mr. Sayles and Mr. Cosford even saw each other during the time period in question—February of 1993—much less that Mr. Sayles had a reasonable opportunity to view her screenplay. She likewise has no evidence to refute Mr. Sayles's affidavit testimony that he'd never heard of Mr. Manders prior to this lawsuit. Plaintiff's specific allegation as to Mr. Manders is that both he and Mr. Sayles attended a dinner party at the home of Professor James Lane and therefore Mr. Manders could have given Mr. Sayles a copy of "Concealed." However, Ms. Herzog was not at the alleged dinner at Professor Lane's home. Moreover, she testified at deposition that Mr. Manders denied having dinner with Mr. Sayles. Plaintiff further admits that Professor Lane told her he did not see Mr. Sayles during the 1993 Miami Film Festival.

As to the members of her committee, Plaintiff cannot identify any specific incident wherein these individuals were actually in Mr. Sayles's presence. At deposition, she stated that Mr. Bowles could have given "Concealed" to Mr. Sayles when Mr. Bowles introduced him at the "Passion Fish" screening, but Mr. Bowles did not introduce Mr. Sayles at the Festival. He testified that he never saw Mr. Sayles during that time. His deposition testimony is collaborated by that of Natalio R. Chediak, Director of the Miami Film Festival. Ms. Chediak testified that she presented Mr. Sayles at the screening of his film "Passion Fish" and that while the film was being shown, she and Mr. Sayles, who was accompanied by Maggie Renzi, went to a South Beach restaurant, possibly The Strand, for a quick dinner. At dinner, Ms. Chediak said she mentioned to Mr. Sayles that she'd left a message for Mr. Cosford but had never heard back from him. (Ms. Chediak said that either Mr. Sayles or Ms. Renzi commented that they'd done the same thing and hadn't reached him.) After dinner, they rushed back to the theater for the question and answer period that followed the screening.

11

Plaintiff has established nothing more than the fact that Mr. Sayles, Mr. Cosford, Mr. Manders, and Mr. Bowles were in the same city during the 1993 Miami Film Festival. Indeed, as to Mr. Cosford, there is no admissible evidence that Mr. Cosford was actually in Miami during that time, beyond the fact that he lived here and, as a film critic, presumably would have attended the Festival. The mere fact that Ms. Herzog's screenplay was physically in the same city in which Mr. Sayles visited did not give him an opportunity to view the manuscript so as to constitute access, notwithstanding the bare physical possibility of such a view. As stated above, "Reasonable opportunity does not encompass any bare possibility in the sense that anything is possible," 4 *Nimmer,* § 13.02[A] at 13-19; "Access may not be inferred through mere speculation or conjecture." *Id., Nimmer* ; *Ferguson,* 584 F.2d at 113; "There must be a reasonable possibility of viewing plaintiff's work—not a bare possibility." *Id., Nimmer* ; *Ferguson.*

The Plaintiff cites certain cases to show that the evidence she has offered is sufficient to establish that Mr. Sayles had access to "Concealed." *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp., supra* ; *Kamar International, Inc. v. Russ Berrie and Co., supra* ; and *Towler v. Sayles,* 76 F.3d 579, 582 (4th Cir.1996).

The plaintiff cites *Krofft,* a Ninth Circuit case, to illustrate that "all that is required to establish the element of access is evidence that the Defendant 'had an opportunity to view or copy' the plaintiff's work." 562 F.2d at 1162. In the *Krofft* case, however, where defendants' "McDonaldland" TV commercials were charged with infringing plaintiffs' copyrighted children's TV show, there was no dispute as to defendants' access to plaintiffs' work because defendants had visited plaintiffs' headquarters to discuss the engineering and design work necessary to produce the McDonaldland commercials and did so after they had been awarded the contract by McDonald's and with no intention of working with the plaintiffs. In this case, access is disputed precisely because there is no such nexus between Defendant Sayles and Plaintiff sufficiently strong to raise a reasonable possibility of access by Defendant Sayles to the Plaintiff's screenplay.

12

The Plaintiff cites *Kamar* to illustrate that that "evidence that a third party with whom both the plaintiff and the defendant were dealing had possession of plaintiff's work is sufficient to establish access by the defendant." 657 F.2d at 1062. In *Kamar,* the Ninth Circuit vacated the district court's finding that plaintiff had no access to any of defendant's stuffed toys because the Court had found that plaintiff did business with the same Korean stuffed animal manufacturers employed by defendant to make defendant's stuffed animals and that this evidence alone demonstrated access. Here, neither Plaintiff nor Defendants were doing business with Mr. Cosford, Mr. Manders, or the members of Ms. Herzog's committee, and the non-party individuals played no role in "Lone Star." Indeed, Mr. Cosford was a respected film critic, not a conduit for the film industry. He did not solicit Ms. Herzog's screenplay, and he declined her request to serve on her committee. As discussed above, the allegations as to Mr. Manders and Mr. Bowles have been refuted by the record evidence; but even if those allegations could be taken as true, they are too speculative and attenuated to establish access.

Interestingly, given the decision in favor of Mr. Sayles on stronger circumstantial evidence of access than submitted here, Plaintiff cites *Towler* for the premise that "[a] court may infer that the alleged infringer had a reasonable possibility of access if the author sent the copyrighted work to a third party intermediary who has a close relationship with the infringer." 76 F.3d at 582. In *Towler,* the plaintiff submitted her screenplay to an individual, Tracy Strain, employed by a film company Ms. Towler believed had ties to Mr. Sayles. Ms. Towler alleged that Mr. Strain agreed to forward the screenplay to Mr. Sayles; however, Ms. Towler proffered no evidence that Mr. Strain actually provided the screenplay to Mr. Sayles and his unrefuted testimony was that he never received Ms. Towler's screenplay. The district court entered judgment for Mr. Sayles as a matter of law. The Fourth Circuit affirmed, holding that "[a] mere possibility that an opportunity for Sayles to view or copy plaintiff's work could have arisen will not suffice. Rather, it must be reasonably possible that the paths of the infringer and infringed work crossed." In this case, the third party, Mr. Cosford, was not employed by and had no ties with Castle Rock; again, the allegation here is that he was given a copy

13

of "Concealed" in the hopes that he would serve on Plaintiff's committee, not pass it along to Mr. Sayles. There is no evidence that Mr. Cosford actually provided a copy of the screenplay to Mr. Sayles, and Mr. Sayles's unrefuted testimony is that he never received Ms. Herzog's screenplay. In stating that "[a] court may infer that the alleged infringer had a reasonable possibility of access if the author sent the copyrighted work to a third party intermediary who has a close relationship with the infringer," the *Towler* court went on to say "[A]n intermediary will fall within this category, for example, if she supervises or works in the same department as the infringer or contributes creative ideas to him." *Id.* at 583. Neither Mr. Cosford, Mr. Manders, or the members of Ms. Herzog's thesis committee satisfy the definition of an intermediary, thereby permitting an inference of access.

A careful study of the cases Plaintiff relies on from other circuits shows a nexus between plaintiff and defendant that does not exist in this case. These cases in fact serve to demonstrate the weakness of Plaintiff's access claim.

The *Ferguson* case, *supra,* is more applicable, both factually and legally. In *Ferguson,* the plaintiff alleged that certain portions of her musical composition "Jeannie Michele" were used in the theme song of a television program aired in 1973 called "A Time to Love." The various individuals and companies to whom she sent her composition, including NBC and BMI, rejected plaintiff's work. She filed a copyright infringement complaint against NBC, the network which aired the show, John Williams, the musician who composed the allegedly infringing theme song, and others. The district court dismissed Mr. Williams for lack of personal jurisdiction, and NBC moved for summary judgment. In support of its motion, it submitted Mr. Williams's affidavit which stated that Mr. Williams had never heard of the plaintiff or her composition. Plaintiff offered no evidence contradicting Mr. Williams's statements. The district court granted NBC's motion for summary judgment and the Fifth Circuit affirmed, holding:

> To find that Williams had access, we would have to assume that (1) although BMI professed no interest in plaintiff's composition and returned the original to her, it made and kept a copy which it later allowed Williams to see, and (2) Williams was lying when he said he had never heard of the plaintiff's composition. Plaintiff has given us no reason to believe that either of these assumptions

14

is true, and certainly they are not obviously compelling. Thus, *a finding of access in this case would be based on speculation or conjecture, and this is impermissible.*

584 F.2d at 113 (emphasis added).

Beyond having her evidence of delivery of "Concealed" to Mr. Cosford, Mr. Manders and the members of her committee and Mr. Cosford's social acquaintance with Mr. Sayles credited, Plaintiff is "entitled to no presumption or assumption as to what happened to the materials after submission; that is something on which [she] must offer sufficient evidence under *Anderson* and *Celotex.*" *Takeall v. Pepsico, Inc.,* 809 F.Supp. 19, 22 (D.Md.1992), *aff'd,* 14 F.3d 596 (4th Cir.1993).

Defendants contend, and we agree, that the cases cited by Plaintiff, as well as the *Ferguson* case, establish that an inference of access based on a third party's possession of the plaintiff's work requires "more than a mere allegation that someone known to the defendant possessed the work in question." *Palmieri v. Estefan* (S.D.N.Y.1995), *aff'd sub nom, on other grounds, Palmieri v. Defaria,* 88 F.3d 136 (2d Cir.1996); *see also, Evans,* 681 F.Supp. at 816 (rejecting suggestion that a reasonable possibility of access arose where a channel of communication was established between a person to whom plaintiff submitted her work, a third party and the alleged infringer).

Mr. Cosford is now deceased and cannot confirm or deny the allegation that Mr. Sayles had access to "Concealed." Ms. Herzog concedes that she never saw Mr. Cosford and Mr. Sayles together during the 1993 Film Festival, and there is no record evidence that anyone else saw them together. To bolster her argument that Mr. Sayles did obtain access to "Concealed" through Mr. Cosford, Plaintiff relies on the hearsay testimony of Anthony Allegro, a Professor in the University of Miami's School of Communications. Ms. Herzog asserts that Mr. Allegro testified that Mr. Cosford told him that he was reading her screenplay and that he found it interesting.[6] Ms. Herzog further asserts that Mr. Allegro also testified that during the time that Mr. Sayles was in Miami for the 1993 Film Festival, Bill Cosford came out of his office at the University of Miami and announced that he was on his way to his home to pick up John Sayles to take him to lunch.

---

[6]Deposition of Anthony T. Allegro at 15-17; 21.

15

At deposition, however, Mr. Allegro testified that he only inferred from Mr. Cosford's alleged statements that he was picking Mr. Sayles up at his home and that he had never seen Mr. Sayles and Mr. Cosford together.[7]

Plaintiff also relies on the deposition testimony of Mr. Bowles to support her theory that Mr. Sayles gained access to "Concealed" through Mr. Cosford. Mr. Bowles's testimony is also based on hearsay;

---

[7]Professor Allegro testified as follows:

Q:      Do you know if Mr. Sayles knew Mr. Cosford?

AA:     Bill Cosford was coming out of his office once. This was in '93, I believe, during the Miami Film Festival ... [w]e chatted for a brief moment and I said, "What are you doing?" It was lunchtime and he said, "I can't go to lunch. I am meeting John Sayles." And I said, "Oh, what are going to do?" He said, "We are going to have lunch."[H]e indicated to me that he was in a hurry, and I inferred from what he said that Sayles was either at his house or he was going to pick him up at his hotel or something like that, and he rushed off and that was the end of it. That was the only thing I know about Sayles and Cosford.

Q:      Do you know if they had lunch?

AA:     I have no idea.

Q:      You said you inferred that Sayles was at his house—

AA:     Yes.

Q:      —or at his hotel. How did you infer that?

AA:     Because of what he said. He said something like—I said, "Where is he," because I though maybe he is coming to class after lunch or something like that, and he said, "I have got to pick him up." I thought he said, he is at my place, but I don't remember, frankly, but that was my impression.

Q:      Did you ever see them together?

AA:     Never.

Q:      Did you ever, other than that incident, discuss Mr. Sayles with Mr. Cosford?

AA:     Never.

Deposition of Anthony T. Allegro at 10-12.

16

moreover, it requires the Court to, in accepting his testimony, assume that since Mr. Sayles stayed with Mr. Cosford in 1992, he stayed with him in 1993, and therefore could have had access to "Concealed."[8]

[8]Mr. Bowles testified as follows:

Q:      Did you know John Sayles?

SB:     I have met him.

Q:      When did you—

SB:     I don't know him well.

Q:      When did you meet him?

SB:     Bill had arranged—well, there are two occasions. One occasion he was down here and I think it was just for a visit where he was staying with Bill. I mean, I heard that from Bill and I invited him to come and talk to my class, which he did. Then on another occasion when he was down here, Bill arranged a dinner at The Strand restaurant on Miami Beach, and I was invited to attend and met—had a nice chat with John Sayles that was mostly talking about—it was shortly after "Eight Men Out" had been released, and we talked a lot about that because I came from Chicago and it is about Chicago White Sox.

Q:      The first occasion you described when Mr. Sayles taught your class, when was that?

SB:     I'm sorry, I can't. It had to have been at the end of the—it had to have been five or six years ago. I'm sorry, I am really not very good with remembering dates.

Q:      Do you recall if that was at the same time he was here for the "Passion Fish"?

SB:     No. I'm sure it was totally different.

Q:      Do you know if it was before or after?

SB:     Oh, it was before. I was trying to think how long. I know it was before.

Q:      Do you have any feel for how long before?

SB:     A year, Two years maybe.

Q:      The second occasion you described, the dinner at The Strand, do you recall when that way?

SB:     My guess is it was a year or so later.

Q:      Do you know if that was at the same time he was here for the "Passion Fish" screening?

SB:     No. I don't think it had anything to do with that, but I'm very hazy about the recollection because I

17

didn't meet him when he was here around the festival when he was doing festival work. It might have been the same time. My guess is it was earlier.

Q:  Do you recall if anyone discussed "Passion Fish"?

SB:  No. I don't think "Passion Fish" was even conceived at that time, but I'm reasonably sure it never came up.

Q:  Were any screenplays passed around or discussed?

SB:  No.

Q:  Other than those two occasions have you ever spent any other time with Mr. Sayles?

SB:  No.

Q:  When was the last time you saw Mr. Sayles? Was it the dinner at The Strand?

SB:  Yes. I never saw him when he was here for the festival. Although, again, the dinner might have been while he was down here for the festival, but it was totally unrelated.

Q:  You said that Mr. Sayles had stayed with Mr. Cosford?

SB:  I had heard that from Bill.

Q:  Were you ever at Mr. Cosford's house when Mr. Sayles was there?

SB:  No.

Q:  Do you know when you heard from Bill that Mr. Sayles stayed at his house?

SB:  No, not really.

Q:  Do you know if when you had dinner at The Strand Mr. Sayles was staying at Mr. Cosford's house?

SB:  I believe so, but I don't know so, because my understanding from Bill was typically when he came down to Miami he would stay with Bill.

Q:  You had no specific information about when he did or how many times?

SB:  No. No. I never saw him at Bill's house.

Q:  Did you see Bill Cosford and John Sayles together during the 1993 Film Festival?

SB:  No.

Q:  Do you know if they saw each other during the film festival?

18

Defendants object to the Court's consideration of the testimony of Mr. Allegro and Mr. Bowles in opposition to their Motion for Summary Judgment because their statements constitute hearsay under Federal Rule of Evidence 801 and as such are not entitled to any weight in considering a motion for summary judgment. *Martin v. John W. Stone Oil Distributor, Inc.,* 819 F.2d 547, 549 (5th Cir.1987) (courts cannot properly consider hearsay evidence in ruling on motion for summary judgment.)  Plaintiff argues that this testimony is admissible under the residual exception of Rule 807 and that this additional evidence, consisting of statements made by Mr. Cosford, now deceased, establishes that Mr. Sayles was at Mr. Cosford's home during the time that Mr. Cosford was in possession of "Concealed."

The Court would not be inclined to admit this evidence at trial because Rule 807 requires that it have the equivalent circumstantial guarantees of trustworthiness covered by the standard exceptions in Rule 803 and Rule 804, and it does not.  The alleged conversation between Mr. Allegro and Mr. Cosford occurred five years ago—"This was in '93, I believe, during the Miami Film Festival."  Mr. Allegro has "no idea" if Mr. Cosford and Mr. Sayles had lunch during that time, and he only inferred that Mr. Sayles was at Mr. Cosford's home—"Because of what he said.  He said something like—I said, 'where is he,' because I thought maybe he is coming to class after lunch or something like that, and he said, 'I have got to pick him up.'  I thought he said, he is at my place, but I don't remember, frankly, but that was my impression."  The only thing Mr.

SB:     No, I don't know.  I would assume they did, but I don't know.

Q:      Do you know if Sayles stayed at Cosford's house during the 1993 festival?

SB:     No.  I mean, no, I don't know.

Q:      You don't know.  Okay. Do you know if Sayles socialized with any other film faculty members during the 1993 Miami Film Festival?

SB:     Not to my knowledge.

Deposition of Stephen Bowles at 10-12;  14-15;  19-20.

Allegro is sure about is that he never saw Mr. Cosford and Mr. Sayles together. Mr. Allegro admits that he doesn't remember what Mr. Cosford said; his testimony is vague, not precise and knowledgeable.

The testimony of Mr. Bowles is also vague, and he admits that he is "really not very good with remembering dates" and his "guess is [the dinner at The Strand] was a year or so later." He doesn't think that the second (and last) time he saw Mr. Sayles was when he was here for the "Passion Fish" screening (during the 1993 Miami Film Festival) but he is "very hazy about the recollection" because he "didn't meet him [Mr. Sayles] when he was here around the festival when he was doing festival work." However, when asked if any screenplays were passed around or discussed, he responded with an unequivocal "no."

There is no way for Defendants to verify the accuracy of the testimony or of the out-of-court statements that the testimony reports, and the reliability of the testimony cannot be taken for granted. *See, Braun v. Lorillard, Inc.,* 84 F.3d 230, 237 (7th Cir.1996) (trial judge properly excluded testimony relating statements made by a deceased declarant upon a finding that they were not sufficiently reliable to qualify as residual hearsay). Nor is this testimony admissible simply because Mr. Cosford is now deceased. *See, Rock v. Huffco,* 922 F.2d 272, 282 (5th Cir.1991) (affirming exclusion of Plaintiffs' decedent's hearsay statements in appeal from summary judgment for defendants in negligence action: "our holding in *Nowell [By and Through Nowell v. Universal Elec. Co.,* 792 F.2d 1310 (5th Cir.1986)] did not provide that statements ... [of deceased declarants] should always be admissible under the residual hearsay exceptions").

Defendants have objected to this hearsay evidence, and we are therefore not directed by *Munoz v. International Alliance of Theatrical Stage Employees, Etc.,* 563 F.2d 205, 214 (5th Cir.1977) or *Offshore Aviation v. Transcon Lines, Inc.,* 831 F.2d 1013, 1015 (11th Cir.1987) to factor it into a decision on summary judgment. Moreover, apart from Defendants' objection, we do not agree with Plaintiff's assertion that this testimony establishes that Mr. Sayles was at Mr. Cosford's home during 1993 and therefore had access to "Concealed." At best, it's hearsay evidence that Mr. Sayles stayed with Mr. Cosford in 1992, before he had possession of "Concealed," and that Mr. Cosford and Mr. Sayles had lunch together in 1993.

20

Even if these statements were admissible and showed that Mr. Cosford had a copy of "Concealed" and that Mr. Sayles socialized with him or stayed at his home during the 1993 Miami Film Festival, this evidence does not establish that Mr. Sayles had a reasonable opportunity to view "Concealed." To find that Mr. Sayles had access, we would have to assume that (1) Mr. Cosford had a copy of "Concealed" with him when he met Mr. Sayles for lunch or that he kept a copy at home and that he allowed Mr. Sayles to see it and (2) that Mr. Sayles was not truthful when he said he had never heard of Plaintiff's composition. There is no allegation that Mr. Cosford had previously contributed creative ideas or material to Mr. Sayles; that they had a business relationship or that Mr. Cosford played any role whatsoever in "Lone Star."

The only reason Plaintiff has given us to assume that either of these assumptions is true is her mention of a rift in the relationship between Mr. Cosford and Mr. Sayles, allegedly as a result of Mr. Cosford coming home to find Mr. Sayles going through things in Mr. Cosford's desk. But, again, the hearsay, in this instance, double hearsay testimony of her witnesses, Mr. Bowles and William Rothman (an associate professor at the University of Miami School of Communications) is not reliable. Mr. Bowles and Mr. Rothman testified only that they heard "rumors" about a rift in the relationship.[9]

---

[9]Mr. Bowles's testimony is as follows:

Q:      Are you aware of a rift, so to speak, in the relationship between Bill Cosford and John Sayles?

SB:     I had heard by a rumor that there was a problem that Bill had with John, but I don't know specifically what it was and I didn't know John Sayles well enough that Bill would talk to me about it.

Q:      What did you hear?

SB:     I had heard, and again, I can't remember where I heard this, but I had heard that Bill had seen John going through some of his papers.

Q:      At his home?

SB:     At his home, yes. Again, that is totally hearsay.

        Deposition of Stephen Bowles at 34.

        Mr. Rothman testified that he probably heard the rumor from Mr. Bowles:

21

In his supplemental affidavit, Mr. Sayles stated that at no time did he ever go through Mr. Cosford's personal papers or belongings and that he was never aware of any "rift" in their relationship. For the reasons explained above in our discussion of the testimony of Mr. Bowles and Mr. Allegro as to whether or not Mr. Cosford and Mr. Sayles were together in 1993, we likewise will not take this hearsay testimony of Mr. Bowles and Mr. Rothman into consideration, nor will we try to discern what inferences could be drawn from their testimony, if any.

Given the evidence presented by Plaintiff, a finding of access would be based on impermissible speculation or conjecture. *Ferguson,* 584 F.2d at 113. To support a finding of access there must be a reasonable possibility of access—not a bare possibility—as we have in this case.

Based upon the foregoing, we find that Plaintiff has failed to prove that there is a reasonable possibility that Defendant Sayles gained access to "Concealed" through his contact with Mr. Cosford, Mr. Manders, and/or the members of her thesis committee.

---

Q: In that conversation Bowles and/or Capwell told you that Cosford was pissed off at Sayles?

WR: Right, and in particular because he seemed to have, you know, I don't know, walked into a room and found Sayles riffling through his things, going through his drawers or whatever, chest of drawers, desk. And I think that Bill Cosford felt that was really not something that a house guest should do.

Q: Did Cosford tell you that ever?

WR: No.

Q: So you heard from—

WR: Right.

Q: —Capwell and/or Bowles that Cosford told them that?

WR: Yeah.

Deposition of William Rothman at 15-16.

22

Another ground upon which the Plaintiff would base access is unusual speed in writing. It is unclear, however, whether she is basing this claim on the "short time frame" in which Mr. Sayles wrote "Lone Star,"[10] or because he allegedly wrote "Lone Star" "within a very short period of time following his access to Plaintiff's work,"[11] or both. John Sayles has stated that he wrote "Lone Star" in approximately three months in late 1994.[12] According to Plaintiff, Mr. Sayles gained access to "Concealed" in February of 1993. In support of this access argument, Ms. Herzog contends that an interview Mr. Sayles gave to *Sprockett,* a guide to films, shows that at the time "Lone Star" was written, Mr. Sayles was in "financial distress," needed a project to direct for Castle Rock, and developed one quickly. However, Mr. Sayles's discussion of a short time frame occurs in the context of how long it took to produce the film, not how long it took to write the screenplay, as alleged.[13]

Unusual speed in the creation of defendant's work may constitute some evidence that the defendant had access to and used plaintiff's work rather than resorting to independent creation. *Scott v. Wkjg, Inc.,* 149 U.S.P.Q. 413 (N.D.Ind.1966), *aff'd,* 376 F.2d 467 (7th Cir.1967), *cert. denied,* 389 U.S. 832, 88 S.Ct. 101, 19 L.Ed.2d 91 (1967). However, Plaintiff has not shown that three months is unusually short for a screenplay of the same length as "Lone Star," either by comparison to film industry standards or the author's own works.

---

[10]Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at 5.

[11]*Id.* at 19.

[12]Defendant Sayles's Response to Plaintiff's Interrogatory No. 5 Exhibit D to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at 5.

[13]In the *Sprocket* interview, Mr. Sayles is comparing the production time for "Lone Star" with that of another of his movies, "Eight Men Out," and he states as follows:

> Three weeks later I showed it to Castle Rock and they said yes, which is about the quickest I've ever raised the money for anything and we were in production very shortly after that. The first script I ever wrote was *Eight Men Out* and I didn't get to make that until eleven years later, so it's not always that quick a process.

*The Sprocket* John Sayles Interview at 2-3, Exhibit E to Plaintiff's Response to Defendants' Motion for Summary Judgment.

She also has not shown how Mr. Sayles's writing of "Lone Star" in late 1994, almost two years after his alleged access in February 1993 to "Concealed," constitutes unusual speed. Plaintiff therefore cannot establish access on this basis.

2.      Substantial Similarity in Protected Expression

Even if the Plaintiff were able to offer evidence sufficient to raise an inference of copying, she would also have to show that "Concealed" is substantially similar in protected expression to "Lone Star." *Benson,* 795 F.2d at 974. To establish substantial similarity, a plaintiff must satisfy a two-pronged test: an extrinsic, or objective test and an intrinsic or subjective test. *Beal v. Paramount Pictures,* 806 F.Supp. 963, 967 (N.D.Ga.1992), *aff'd,* 20 F.3d 454 (11th Cir.1994). Under the extrinsic test, a court will inquire into whether, as an objective matter, the works are substantially similar in protected expression. *Beal,* 20 F.3d at 461-64. As a part of this test, a court will determine whether a plaintiff seeks to protect only uncopyrightable elements; if so, the court will grant summary judgment for defendant. *Id.* Under the extrinsic test, expert testimony and analytic dissection are appropriate. *Id.* Under the intrinsic test, a court will determine whether, upon proper instruction, a reasonable jury would find that the works are substantially similar. *Beal,* 806 F.Supp. at 967. A court may grant summary judgment for defendant as a matter of law if the similarity between the two works concerns only noncopyrightable elements of the plaintiff's work *or* if no reasonable jury would find that the two works are substantially similar. *Id.*

In this case, Plaintiff alleges that Defendants have infringed her copyright because both "Concealed" and "Lone Star": use flashback sequences to shift from the present to the past; take place in rural, "redneck" towns with histories of racial tension that are dominated by corrupt public officials; make reference to land obtained as a result of massacres; have powerful citizens who conspire to hide the truth of the murders until their secrets are uncovered by the film's protagonists; use the device that deaths were due to foul play instead of natural causes; use the consequences of a prank to set in motion a chain of events and revelations central to the secrets of the town and its residents; recount the massacre of Indians via flashbacks of the witnesses;

24

use a keyring/ring to identify the victims; use information obtained from elderly men at roadside stands to unravel the role of the father in the town's hidden past; have protagonists who are second-generation sheriffs who return to their hometown and solve a murder; mention black Seminole Indians; have evil sheriffs who blackmail townspeople and are killed; have prominent businesswomen who harbor secrets central to the plot; and have old-timers who help solve the mysteries by telling the protagonists about the town's history.[14]

Defendants refute these allegations, asserting that Plaintiff has mischaracterized certain matters; that any common elements are unprotectible ideas or *scenes a faire* ; and that the specific expressions are dissimilar.

Lists of similarities between the two works are "inherently subjective and unreliable," particularly where the list contains random similarities, and many such similarities could be found in very dissimilar works. *Beal,* 20 F.3d at 460; *see also Williams v. Crichton,* 84 F.3d 581, 590 (2nd Cir.1996) (lists of random similarities held not probative of substantial similarity because such lists fail "to address the underlying issue of whether a lay observer would view the works as a whole substantially similar to one another").

In adjudicating a copyright dispute, the Court must compare the works in question. *Beal,* 20 F.3d at 456 (citing *Autoskill, Inc. v. National Educ. Support Sys., Inc.,* 994 F.2d 1476, 1490 (10th Cir.), *cert. denied,* 510 U.S. 916, 114 S.Ct. 307, 126 L.Ed.2d 254 (1993)). We have independently reviewed and compared the two screenplays, "Concealed" and "Lone Star," and viewed the "Lone Star" film in order to compare different aspects of the works in question, including characters, theme, plot, setting, and mood and pace. As our analysis below indicates, we find that these similarities either consist of noncopyrightable elements or elements that cannot be considered similar.

(a)     *Characters*

As to the protection afforded characters, we are once again guided by Judge Hand's opinion in *Nichols*:

---

[14]Plaintiff's Response to Defendant Castle Rock's First Set of Interrogatories.

> If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the origin of the species.

45 F.2d at 121.

Plaintiff contends that the protagonists, Marty and Sam, and the antagonists, Sheriff Wetherspoon and Charley Wade, are substantially similar.

Marty and Sam share one very broad similarity—they are both law enforcement officers whose fathers were sheriffs. Beyond this uncopyrightable idea, however, these characters are completely different in background story, personal attributes, and most distinctively, in purpose. Marty wants to prove herself; Sam needs to learn the truth about his father.

Marty returns from New York City to Waukeena because she fears that her hesitation to fire her weapon cost the life of a child kidnap victim. She takes a job with the local sheriff to prove to herself that she can still perform as a police officer and makes a bet with the sheriff because she wants to prove she can do more than routine duty in a small town. She picks a name out of an obituary column, Tom Locke, a local motel owner, thought to have died a few days before of natural causes. She investigates and learns that he might have been murdered. Marty does not appear to have a personal stake in this investigation; she is motivated to prevent more murders, including her own. At the end of the screenplay, she discovers that her father, a former sheriff, had been forced out of office by Locke and other prominent citizens when he learned of their land fraud conspiracy. Marty does not seem to be distressed by this revelation; nor had she previously been curious as to why her father might have left his post as town sheriff.

In contrast, Sam, the sheriff of Rio County, is driven to solve a forty year old murder even though he suspects the killer was his own father. As the townspeople point out, one reason Sam is willing to blame his father for the murder of Wade, another of the town's former sheriffs, is Sam's lingering resentment of his father for breaking up the youthful affair between Sam and Pilar Cruz. Sam insists he is only doing his job,

26

and presses forward with the investigation despite the fact that his father is a local legend who is about to be honored by having the courthouse renamed in his honor. Sam's investigation is prompted by the discovery of old bones and a sheriff's badge found in the desert; such proof of foul play requires him to look into the matter. In the end, Sam learns that his father is innocent of the murder and was not prejudiced against Hispanics. This discovery relieves Sam of a psychological burden he has carried all his life.

The romantic interests of Marty and Sam are another marked difference. The twenty year attraction between Sam and Pilar, complicated because of the difference in their races, is finally consummated. However, during the investigation of Wade's murder, Sam has learned that his father had an affair with Pilar's mother. Pilar, Sam's lover, is Buddy's daughter, and thus, Sam's own sister. In contrast, Marty has no such love interest—she rejects Guy's advances until the end of the screenplay, when she agrees to have dinner with him. This "relationship" plays no role in her investigation.

Sheriff Wetherspoon in "Concealed" and Sheriff Wade in "Lone Star," as indicated by their titles, are both lawmen; they engaged in murder and other criminal activity and were killed by their deputies. These similarities are too broad and underdeveloped to be the appropriate subject of copyright protection, *see Nichols,* 45 F.2d at 121. The broader outlines of the characters are not copyrightable, and the specific expression of the characters differs greatly.

(b)     *Theme*

The basic theme in both works is that the past has the power to influence the present. This truism is not entitled to copyright protection, and there is no substantial similarity of expression. "Concealed" is narrowly focused on Marty and her investigation of a recent murder. This time, when she is confronted with danger, she acts courageously. In self-defense, she shoots and kills Sheriff Wetherspoon, thereby regaining her self-confidence. She then becomes the sheriff of Waukeena.

In "Lone Star," the story of Sam's investigation of a murder that happened forty years ago is used to develop several themes, including clearing Sam's father's name; reuniting Sam with Pilar; reintegrating three

27

generations of a black family; and spiritually regenerating Pilar's mother, Mercedes. The past is viewed from the different racial perspectives of the characters and deeper questions concerning how morality and prejudice influence identity and love are asked and answered.

(c)      *Plot*

A murder investigation which reveals the corrupt past of a small town is the primary plot of both "Concealed" and "Lone Star." This is, however, a familiar plot that is not subject to copyright protection.[15] There is great difference in expression between the works. "Concealed" begins with a present day murder and the investigation of that murder causes a series of subsequent murders. The protagonist, Marty, is driven to complete this investigation in order to save lives, her own and those of her colleagues. The past crimes discovered serve to illuminate the reasons for the present killings, but Marty was never motivated to look into the truth concerning the past crimes, or by any prior personal feelings. The discovery of her father's role in these crimes is incidental to her investigation. However, in "Lone Star," the only murder being investigated took place forty years ago. The protagonist, Sam, is driven to solve that murder to see that truth and justice are honored—the killer, whom he suspects is his own father, is long dead; Sam's life is never in danger. And, in contrast to "Concealed," as we previously noted, there are a number of subplots in "Lone Star" that are carefully developed.

For example, the subplot of the reintegration of three generations of a black family involves Otis Payne, an older black man who witnessed Wade's murder and participated in the cover-up. Otis still runs the black night spot where the incident occurred. His estranged son Delmore is the new commander of the nearby Army training installation where Wade's bones were found. Del's son, Chet, becomes fascinated with his

---

[15]Defendants provided these examples: Faulkner's "A Rose for Emily" shows that a small Southern town has allowed one of its patriarchs to "get away with murder" for many years out of a misguided sense of noblesse oblige; "Chinatown" tells the story of a detective's dogged investigation into the corrupt land dealings upon which Los Angeles was built, an investigation also prompted by the death of a prominent citizen; "Dead Again" features a similar unraveling of a sordid past's influence upon present day individuals, also lovers, who are driven to dig up "old bones"; "To Kill a Mockingbird" traces the effects of long kept communal secrets and the need to bring them out into the open to exonerate innocent parties and quell racial tensions.

28

grandfather. When he visits his grandfather's bar, he learns that Otis is interested in black history and that the family has Seminole blood. As a result of Sam's investigation, these three generations of black men are reintegrated.

Another subplot focuses on the plight of Mexicans illegally crossing the border and is explored through Pilar's mother, Mercedes Cruz, who, despite her disdain for "wetbacks," helps one of her restaurant workers get medical attention for his pregnant bride who has entered the U.S. illegally.

(d)    *Setting*

Both "Concealed" and "Lone Star" take place in small towns, but Waukeena, Florida and Rio County, Texas, are very different. In "Concealed," the slow pace of life in Waukeena bores Marty and heightens her feelings of inadequacy, thus motivating her to undertake the investigation of Locke's death. Although Plaintiff contends that Waukeena has a history of racial/ethnic tension, nothing in "Concealed" suggests that racial relations in Waukeena are of any interest to Marty or to Waukeena's citizens. Rio County, Texas, borders Mexico, and this setting gives rise to the racial and sociological tensions of the interrelated subplots. Sam considers not running for reelection as sheriff because Rio County is predominantly Mexican-American and he thinks the sheriff should perhaps be Hispanic.

In both screenplays, the protagonists visit informants at roadside stands. In "Concealed," Marty obtains information from an elderly retired city clerk who sells tomatoes. He provides Marty with important information regarding the land deal that enables her to solve the case. In "Lone Star," Sam talks to an elderly Indian who sells (fake) relics to tourists. This man, who is much more colorful than the city clerk, tells Sam that his father had a mistress. Sam follows this lead to San Antonio where he finds letters which reveal that the mistress was Mercedes Cruz, Pilar's mother. Unlike the city clerk, this man is not crucial to Sam's investigation of Wade's murder. There is nothing unique about roadside stands in small towns or police officers getting information from private citizens; there is no substantial similarity in the expression of these encounters.

29

(e)     *Mood and Pace*

"Concealed" is an action-adventure featuring the exploits of a female law enforcement officer from the big city proving herself in the male-dominated sheriff's department of her small hometown. The mood is serious and Marty's life is in danger from the beginning. The focus is on the outcome of her investigation, with little attention paid to romance or other subplots. The pace is rapid and tense, with the action taking place over a few days. The murder of the Seminole settlers of Waukeena by the white men who wanted their land is used to show why Marty's father left town, not to explore the historical significance of this injustice.

"Lone Star" involves very little action and/or adventure. It focuses on the discovery of why Charley Wade was murdered—reasons which are related to the enduring racial tensions in the border area. Sam's life is never in danger and there is no violence or threat of violence portrayed as he carries out his investigation. With its emphasis on the renewed, developing romance between Sam and Pilar, the reunification of the black Payne family, the humanizing of Mercedes Cruz, and the closing of racial rifts in the community, "Lone Star" is much more thoughtful and reflective than tension-filled. As a result, and even though the story takes place within a few days, the pace is slow and stately.

(f)     *Other Claims of Similarity*

*Flashbacks.* Although Plaintiff alleges that both "Concealed" and "Lone Star" use flashback scenes, there is only one flashback scene in "Concealed," and it is a simple cutaway to the past signaled by dialogue. However, in "Lone Star," Mr. Sayles uses flashbacks throughout "Lone Star" and employs the method in an unusual way. For instance, in the interview with the old black woman, he cuts to the past confrontation of young Otis with Charley Wade, then returns to Otis's bar, with Otis talking in the present. This stylistic use of flashbacks adds an original element to "Lone Star" that is not present in "Concealed."

As to the use of flashback to convey crucial information remembered by witnesses to a crime, Defendants point out that this is a familiar device in film and fiction and provide a general example: witnesses in courtroom scenes begin to recall crucial events, only to have the scene shift to flashback as the

30

past events unfold. Defendants also provide three more specific examples of well-known films that use flashbacks in this manner: "Roshomon" uses the device to show how the facts of a crime differ according to the memory flaws and personal predisposition of the witness; "Citizen Kane" uses the device to show how different witnesses remember similar events from Kane's life in opposing ways; and "the Usual Suspects" where throughout the film the investigation of a suspected drug deal gone bad is portrayed in flashback.

*Black Seminole Indians.* Both screenplays mention black Seminole Indians. In "Concealed," the massacre of the Seminole Indians with whom Sheriff Wetherspoon once lived motivates him to seek revenge and murder several men; his heritage is central to the plot. In "Lone Star," Otis, the black grandfather, pays homage to black Seminole warriors by maintaining a museum in his home. Chet, his grandson, is fascinated by the museum and proud to learn that he has Seminole blood. This information relates to the subplot of the reintegration of the black family.

Plaintiff's allegations to the contrary, there is no "massacre" in "Lone Star." In "Lone Star," Sheriff Wade murdered Eladio Cruz alongside the road; in "Concealed," four men who wanted to build a town on Seminole land participated in the massacre of the Seminole Indians.

The history of the black Seminoles is well-documented in literature. This racial background is not a unique, copyrightable element. Moreover, Mr. Sayles's interest in the Seminoles predates his alleged access to "Concealed." As Defendants point out, in 1991, Mr. Sayles published a novel entitled "Las Gusanos," wherein the narrator describes a scene in which his grandfather explains his true mixed-blood heritage: "You got Indian blood in you, son. You be proud of that." "Las Gusanos" at 175.

*Key Chain/Masonic Ring as Means of Identification.* Beyond the obvious fact that personal effects are used to investigate crimes in real life as well as in fiction and film, there is a difference in the function of the initialed key chain in "Concealed" and the Masonic ring in "Lone Star." At the beginning of "Lone Star," Sam uses a Masonic ring found with the skeleton in the desert to identify Wade's body and is interested in Wade's ring as part of the crime solving process. In "Concealed," the identity of Tom Locke's body was

31

never an issue and the discovery of his initialed key chain at the end of the film explains Sheriff Wetherspoon's motivation to murder, but plays no role in Marty's investigation.

*Blackmailing Sheriffs Killed by Their Deputies.* "Crooked law enforcement officers brought to justice by their peers" is a basic, unprotectible police story convention. *See, e.g.,* "Chinatown" and "Prince of the City." Inspection of the alleged similarities reveals that Defendants' expression of these stock elements differs from Plaintiff's: "Lone Star" begins with the investigation of Wade's murder forty years ago by Deputy Sheriff Hollis. "Concealed" concludes with Marty shooting Sheriff Wetherspoon.

*Prominent Businesswomen Harboring Secrets.* In "Concealed," Sue Turner kept quiet about the rape and murder of a young Indian woman so her husband would not be told about her affair with a local businessman; she obstructs justice and is guilty of a crime. In "Lone Star" Mercedes Cruz had an affair with Sam Deeds's father and had a daughter, Pilar, whom Sam has fallen in love with. The secret Mercedes Cruz kept has nothing to do with the murder of Charley Wade; Deputy Sheriff Hollis killed Wade to save Otis's life.

Characters who keep secrets are part and parcel of the murder mystery genre and are not protectible.

*Old-Timers Tell Sheriffs About the Town.* In "Concealed," Beatrice Hangstrom is an elderly friend of Marty's mother. She plays a significant, recurring role as Marty's informant and confidant. She refers Marty to the former city clerk who gives Marty the crucial information she needs about the names on an original property deed. In "Lone Star," Minnie Bledsoe appears once as an elderly black woman who tells Sam the story of an incident between Otis and Charley Wade which leads Sam to question Otis about the night Wade was shot. While elderly characters are used in both works, there is no substantial similarity in their means or methods of expression.

*Corpses/Death Due to Foul Play Instead of Natural Causes.* "Lone Star" begins with the discovery of a human skeleton in the desert. From the beginning, Sam suspects foul play and presumes his father killed Charley Wade. There is no corpse found in "Concealed." Marty sees Locke's obituary in the paper and

decides to look into his death by chance. Aside from these differences, death due to foul play instead of natural causes is a standard element of murder mysteries.

*Consequences of Prank Spark Chain of Events and Revelations.* In "Concealed," Marty's fellow deputies set her up to interview Eo, a drunk and naked Seminole Indian, who is in jail for a minor offense; although Eo turns out to be the caretaker at Locke's estate, this prank has nothing to do with Marty's investigation of Locke's death. In "Lone Star," Pilar's son was arrested for the theft of a CD player; although Sam's encounter with Pilar at the jail introduces one of the subplots, the affair between Sam and Pilar, Sam began his murder investigation when Wade's skeleton was discovered in the desert, before Pilar's son was arrested. There is no similarity between these episodes.

In summary, our review indicates that the few similarities between "Concealed" and "Lone Star" involve noncopyrightable elements and that no reasonable juror could find the works substantially similar in expression.[16]

## CONCLUSION

---

[16]Courts have found far more significant similarities insufficient to create issues of disputed fact and have granted summary judgment. *E.g., Beal,* 20 F.3d 454 (11th Cir.1994) (insufficient similarity where both works involved wealthy foreign princes coming to America in search of wife, parental interference, initial choice of inappropriate mate, ultimately wise choice of mate, and return to native country); *Evans,* 681 F.Supp. 813, 818 (S.D.Fla.1988) (insufficient similarity where both works featured cartoon characters inhabiting an underwater world, involved similar names, and portrayed similar experiences); *Kouf v. Walt Disney Pictures & Television,* 16 F.3d 1042 (9th Cir.1994) (insufficient similarity where both screenplays featured individuals using scientific formulas which shrink people to miniscule proportions); *Berkic v. Crichton,* 761 F.2d 1289, 1293 (9th Cir.1985), *cert. denied,* 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 69 (1985) (insufficient similarity where both works were about young professionals investigating and exposing criminal organizations' schemes to murder young adults to remove and sell their organs); *Warner Bros. Inc. v. American Broadcasting Cos.,* 720 F.2d 231 (2d Cir.1983) (insufficient similarity where both works centered on white male "superhero" who wore tight costume and cape, flew with arms extended, led double life, and rescued innocent people from evil-doers); *Litchfield v. Spielberg,* 736 F.2d 1352, 1354-55 (9th Cir.1984) (insufficient similarity where both works concerned alien with extraordinary powers who befriended child, was welcomed into family, adopted human habits, thwarted evil-doers, and then returned to his own planet); *Sinicola v. Warner Bros., Inc.,* 948 F.Supp. 1176 (E.D.N.Y.1996) (insufficient similarity where both works involved Italian American police officers seeking revenge for Mob-related killings of third parties); *Anderson v. Paramount Pictures Corp.,* 617 F.Supp. 1 (C.D.Cal.1985) (insufficient similarity where both screenplays concerned wager between two wealthy friends over whether uneducated man could be made to pass as successful businessman, and featured beggar pretending to be blind by walking with dark glasses and cup, a scene where the bettors bribe the man to enter their limousine and references to Harvard and Russians).

33

For the foregoing reasons, we find that the Plaintiff has failed to produce evidence sufficient, even when viewed in the light most favorable to her, to support a jury finding of access on the part of Defendant John Sayles to her work, or substantial similarity between "Concealed" and "Lone Star." Summary judgment is therefore GRANTED in favor of the Defendants.

DONE and ORDERED at Miami, Florida, this 29th day of September, 1998.

Counsel of Record:

*Attorneys for Plaintiff*

Eric D. Isicoff

Teresa Ragatz

Isicoff & Ragatz, P.A.

1101 Brickell Avenue

Suite 800 South Tower

Miami, FL 33131

305.373.3232

305.373.3233 FAX

*Attorneys for Defendants*

Thomas G. Schultz

Suzanne H. Youmans

McDermott, Will & Emery

201 South Biscayne Boulevard

200 Miami Center

Miami, FL 33131

305.347.6549

305.347.6500 FAX

Robert Rotstein

McDermott, Will & Emery

2049 Century ParkEast

34th Floor

Los Angeles, CA 90067-3208

310.284.6101

310.277.4730 FAX

* * *