**SUNTRUST BANK, as Trustee of the Stephens Mitchell Trusts f/b/o Eugene Muse Mitchell and Joseph Reynolds Mitchell, Plaintiff,**

v.

**HOUGHTON MIFFLIN COMPANY, Defendant.**

**CIV.A.No. 1:01–CV–701–CAP.**

United States District Court,
N.D. Georgia,
Atlanta Division.

April 20, 2001.

2001, the court held a hearing on the plaintiff's request for a TRO. The court has not issued a TRO. On April 18, 2001, the court conducted a hearing on the plaintiff's request for a preliminary injunction.

## I. *BACKGROUND FACTS AND PROCEDURAL HISTORY*

The Mitchell Trusts are the copyright owners of the novel *Gone With the Wind,* by Margaret Mitchell. Published in 1936, the book has enjoyed widespread acclaim, been translated into over 30 languages, and has sold tens of millions of copies. Over the years, the Mitchell Trusts have authorized derivative works of *Gone With the Wind,* as well as the use of certain elements of *Gone With the Wind* in a wide variety of commercial contexts.

For example, in 1988, the Mitchell Trusts authorized the publication of *Scarlett: The Sequel to Margaret Mitchell's Gone With the Wind* by Alexandra Ripley and published by Warner Books in 1991 (hereinafter *"Scarlett: The Sequel"*), which incorporated the characters, character traits, settings, plot lines, title and other elements of the original novel.

The Mitchell Trusts have also entered into a contract authorizing, under certain conditions, the making of a second sequel to *Gone With the Wind* again using copyrighted elements of the original novel (hereinafter the "Second Sequel"). The Second Sequel, if approved by the Mitchell Trusts, will be published by St. Martin's Press.[1] The Mitchell Trusts are the sole owners of the copyright to *Scarlett: The Sequel* and, by written agreement, will be the sole copyright owners of the Second Sequel. The contract for the Second Sequel specifically provides that neither

William B. B. Smith, Ralph Ragan Morrison, Anne Moody Johnson, Jones Day Reavis & Pogue, Atlanta, GA, Maura J. Wogan, Jessie F. Beeber, Thomas D. Selz, Martin Garbus, Richard Kurnit, Frankfurt Garbus Kurnit Klein & Selz, New York City, for plaintiff.

Miles J. Alexander, Jerre B. Swann, W. Swain Wood, Kilpatrick Stockton, Atlanta, GA, for defendant.

Peter Crane Canfield, Dow Lohnes & Albertson, Atlanta, GA, Leon Friedman, Office of Leon Friedman, New York City, for American Booksellers Foundation for Freedom of Expression, Freedom to Read Foundation and Pen American Center.

### *ORDER*

PANNELL, District Judge.

The plaintiff filed the instant action seeking a temporary restraining order ("TRO") and a preliminary injunction to enjoin the defendant from further publication and distribution of the book *The Wind Done Gone.* The case arises under the Copyright Act and, as such, the court has federal question subject matter jurisdiction. *See* 17 U.S.C. §§ 101 et seq.; *and see* 28 U.S.C. § 1338(a). On March 29,

---

1. *See* Dellon Aff. Ex. A at ¶¶ 7 & 8 [Doc. No. 21–1].

Scarlett O'Hara nor Rhett Butler may die, thereby, according to the plaintiff, preserving the reading public's expectations, as well as the Mitchell Trusts' ability to authorize sequels in the future.

According to the plaintiff, *The Wind Done Gone* is an unauthorized sequel to *Gone With the Wind.* The new work chronicles the diary of a woman named Cynara, the illegitimate daughter of Planter, a plantation owner, and Mammy, a slave who cares for his children. The plaintiff's copyright infringement claim rests on the fact that the defendant's book: (1) explicitly refers to *Gone With the Wind* in its foreword; (2) copies core characters, character traits, and relationships from *Gone With the Wind;* (3) copies and summarizes famous scenes and other elements of the plot from *Gone With the Wind;* and (4) copies verbatim dialogues and descriptions from *Gone With the Wind.* After discovering these similarities, the plaintiff filed the instant suit on March 16, 2001. The plaintiff has asked the defendant to withdraw the book from publication and distribution, but the defendant has refused to do so.

## II. *LEGAL DISCUSSION*

■ The purpose of a preliminary injunction is to protect the movant from irreparable harm and to preserve the status quo until the district court renders a decision on the merits. *See Canal Auth. of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).[2] In seeking a preliminary injunction, a plaintiff in a copyright infringement case, as in all others, must establish that:

(1) there is a substantial likelihood that the moving party will prevail on the merits;

(2) the moving party will suffer irreparable injury if the injunction is not granted;

(3) the threatened injury to the moving party outweighs the threatened harm the proposed injunction may cause the opposing party; and

(4) the injunction, if issued, would not be adverse to the public interest.

*Johnson v. U.S. Dept. Of Agri.,* 734 F.2d 774, 781 (11th Cir.1984); *see* Fed.R.Civ.P. 65.

■ The first element is generally regarded as the most important because the granting of injunctive relief would be inequitable if the movant has no chance of succeeding on the merits of the case. *See Canal Auth. of Fla.,* 489 F.2d at 576; *see generally Gonzalez v. Reno,* 2000 WL 381901 (11th Cir.2000). Here, the plaintiff must not only demonstrate a likelihood of success on the elements of its prima facie case but also as to the asserted defenses by the defendant, such as the fair use doctrine. *See Metro–Goldwyn–Mayer, Inc. v. Showcase Atlanta Cooperative Productions, Inc.,* 479 F.Supp. 351, 355 (N.D.Ga.1979) (citing *Canal Auth. of Fla.,* 489 F.2d at 567); *and see* 17 U.S.C. § 107. The remaining three elements essentially require the court to balance the equities of the matter in dispute in order to "choose the course of action that will minimize the costs of being mistaken." *American Hospital Supply Corp. v. Hospital Products, Ltd.,* 780 F.2d 589, 593 (7th Cir.1986). Ultimately, the decision to grant injunctive relief rests within the "sound discretion of the district court." *Sierra Club v. Georgia Power Co.,* 180 F.3d 1309, 1310 (11th Cir.

---

**2.** Decisions of the former Fifth Circuit rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit.

*See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

1999) (citations omitted). Given the foregoing principles and the record thus far developed, the court proceeds to consider the motions for injunctive relief.

## A. *Likelihood of Success on the Merits*

### 1. *Infringement by the Defendant*

■ In order to obtain injunctive relief for copyright infringement, the plaintiff must show ownership of a valid, existing copyright and copying of the copyrighted material by the defendant. *See generally Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1512 (11th Cir.1984). The court finds that the plaintiff has ownership of a valid, existing copyright in the novel *Gone With the Wind.*[3] Thus, the plaintiff's right to prepare derivative works based on the copyrighted work automatically arises under 17 U.S.C. § 106(2), and the plaintiff is entitled to prevent any unauthorized musical arrangement, dramatization, or any other form in which the work may be recast, transformed, or adapted. *Metro–Goldwyn–Mayer, Inc.,* 479 F.Supp. at 355–56; *see generally* 17 U.S.C. § 106.

■ To establish a prima facie case the plaintiff must demonstrate copying by the defendant of the copyrighted work. *Id.;*

see also *Walt Disney Productions v. Air Pirates,* 581 F.2d 751 (9th Cir.1978); *and* see *Berlin v. E.C. Publications, Inc.,* 329 F.2d 541 (2d Cir.1964). If, as here, the plaintiff has no direct proof of copying, then the plaintiff may prove copying by demonstrating that the defendant had access to the copyrighted work and that the works are "substantially similar." *See Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1248 (11th Cir.1999) (citing *Benson v. Coca–Cola Co.,* 795 F.2d 973, 974 (11th Cir.1986)). Ms. Randall admits that she has twice read *Gone With the Wind.*[4] Thus, the court finds that the plaintiff has established the first element of its prima facie case.

■ To show substantial similarity, the plaintiff must show that "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 829 (11th Cir.1982). Although not an exhaustive list, the Eleventh Circuit has made clear that "sequences of events which necessarily follow a common theme ..., [i]ncidents, characters, or settings that are indispensable or standard in the treatment of a given topic are not copyrightable." *Herzog,* 193 F.3d at 1248. (citations and internal quotations omitted).

---

**3.** Ms. Randall denies having had access to *Scarlett: The Sequel* prior to writing *The Wind Done Gone.* Because the court bases its conclusions of fact and law irrespective of *Scarlett: The Sequel,* it is unnecessary to compare any similarities between it and the new work. In doing so, the court does not address the issue of whether *The Wind Done Gone* infringes copyrighted material contained in *Scarlett: The Sequel.*

**4.** "When I was twelve, I read *Gone With the Wind* (GWTW) and fell in love with the novel. This was a troubled love from the beginning. I had to overlook racist stereotyping and Klan

whitewashing to appreciate the ambitious, resilient, hard-working, hard-loving character who is Scarlett. Like so many others, I managed to do it. Then one day, rereading the book, enormous questions arose for me: Where are the mulattos on Tara? Where is Scarlett's half-sister? Almost immediately I knew I had to tell her story, tell the story that hadn't been told. Tell it because the silence injured me." Alice Randall, *The Wind Done Gone,* "A Conversation With Alice Randall" at 211 (Houghton Mifflin Company 2001) (Uncorrected Proof/Advance Reading Copy).

Therefore, the court in determining whether infringement has occurred must decide whether the similarities between *Gone With the Wind* and *The Wind Done Gone* "are substantial from the point of view of the lay reader and whether those similarities involve copyrightable material." *Id.* Judge Learned Hand best articulated what has become the guiding principle for courts to use in applying the substantial similarity test:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the general statement of what the play is about, and at times consist of only its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which apart from their expression, his property is never extended.... Nobody has ever been able to fix that boundary, and nobody ever can.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930).

■ The plaintiff in establishing substantial similarity must satisfy both an extrinsic, or objective, test, as well as an intrinsic, or subjective, test. *Herzog* 193 F.3d at 1257.

■ The plaintiff contends that *The Wind Done Gone* is an unauthorized sequel to *Gone With the Wind.* The plaintiff argues that the defendant seeks to associate its work with *Gone With the Wind* in order to trade off of its success. With respect to the similarities between the works, the plaintiff argues that *The Wind Done Gone* copies characters, character traits and relationships, settings, and situations of *Gone With the Wind,* impermissibly summarizes its plot, and copies verbatim certain dialogues and passages. *See* Plaintiff's Memorandum of Law in Support of Its Motion for a Temporary Restraining Order and Preliminary Injunction at 19 [Doc. No. 5–1]. Thus, relying on *Metro–Goldwyn–Mayer, Inc.,* the plaintiff argues that the works are substantially similar in their "foundation, materials of locale, settings, characters, situations and relationships." 479 F.Supp. at 355.

Naturally, by contrast, the defendant argues that the two works are not substantially similar. The defendant contends that while *The Wind Done Gone* may have borrowed "ideas" from *Gone With the Wind,* such borrowing does not constitute copyright infringement since there is no substantial similarity in a protectable expression. *See* Defendant's Response in Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction at 12 [Doc. No. 11–1]. The defendant argues that even if it took the basic plot of the wholly original work *Gone With the Wind* because of its "amazing success," there is no monopoly in using the Reconstruction era as a setting. Simply, according to the defendant, while Ms. Mitchell may have "discovered the vein, she could not keep it to herself; so defined, the theme was too generalized an abstraction from what she wrote." *Nichols,* 45 F.2d at 122. Although the defendant concedes that there are similarities in the setting, characters, and plot between the works, it argues that thematically the works are radically different and written in very different styles with very different purposes in mind.

In support of its motions for a TRO and preliminary injunction, the plaintiff has filed a series of exhibits that contain charts

demonstrating the similarities between the two works. Such lists, however, are " 'inherently subjective and unreliable,' particularly where the list contains random similarities, and many such similarities could be found in very dissimilar works." *Herzog*, 193 F.3d at 1257 (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 460 (11th Cir.1994)). Consistent with the Eleventh Circuit's instructions to "compare the works in question," the court must consider the whole of both works. *See id.* at 1257 (citations omitted). This independent review and comparison requires more than simply reading the two works but, rather, includes assimilating the tone, plot, characters, theme, setting, mood, and pace of each work and then determining whether the new work contains so much of the prior work as to be substantially similar. *See id.* at 1248, 1257–62.

■ The characters of *Gone With the Wind* are copyrightable, apart from the story they inhabit, and cannot be used in a new work without the permission of the copyright owner. *See generally Metro–Goldwyn–Mayer, Inc. v. American Honda Motor Co., Inc.*, 900 F.Supp. 1287, 1295–1297 (C.D.Cal.1995) (explaining that James Bond is a unique character whose *sui generis* qualities so specifically characterize him that his character is sufficiently delineated for copyright protection apart from the stories and films that he populates). Courts in the Eleventh Circuit have previously recognized that the exclusive right to use *Gone With the Wind*'s characters belongs to the Mitchell Trusts. *See e.g. Metro–Goldwyn–Mayer, Inc.*, 479 F.Supp. at 355. *The Wind Done Gone* uses fifteen fictional characters from *Gone With the Wind*, incorporating their physical attributes, mannerisms, and the distinct features

that Ms. Mitchell used to describe them, as well as their complex relationships with each other. Moreover, the various locales (Atlanta, Tara or Tata, Twelve Oaks or Twelve Slaves Strong, Charleston), settings, characters, themes, and plot of *The Wind Done Gone* closely mirror those contained in *Gone With the Wind*.

The earlier work is a third-person epic, whereas the new work is told in the first-person as an intimate diary of the life of Cynara. Thematically, the new work provides a different viewpoint of the antebellum world. This new vision, however, does not simply comment on the antebellum South by giving the untold perspective of a mulatto slave who is sold from the plantation, develops a relationship with a caucasian, lives well and travels the world. Rather, the new work tells *Gone With the Wind*'s story, using its characters, settings, and plot. The new work does not simply make use of non-copyrightable stock scenes or historical events, like the antebellum South, Reconstruction, the mistreatment of slaves, or the relationship between slave and master.

The defendant argues that *The Wind Done Gone* uses general references to *Gone With the Wind* in order to parody it and does not infringe on its copyrights. The court disagrees. In many places the new work merely paraphrases *Gone With the Wind* and does not, as the defendant suggests, subtly allude to the older work. The new work does not create a new story of the South during Reconstruction. Rather, with the canvas of *Gone With the Wind* as a backdrop, *The Wind Done Gone* repeats the story of *Gone With the Wind*, by utilizing a detailed encapsulation of the older work and exploiting its copyrighted characters, story lines, and settings as the palette for the new story.

■ The court's finding that *The Wind Done Gone* copies from *Gone With the Wind* as a factual matter is not dispositive. *See Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 75 (2d Cir. 1997); *see also Greenberg v. National Geographic Society*, 241 F.3d 241 (11th Cir. 2001). Not all copying is copyright infringement, and only the copying of the original elements of a protected work gives rise to an infringement claim. *See Feist Publications Co., Inc. v. Rural Telephone Serv., Inc.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1295, 113 L.Ed.2d 358 (1991) (explaining that the mere use of information contained in a telephone directory for use in local white pages without a substantial copying of the copyrighted format of the original listing does not constitute infringement); *and see also Paramount Pictures Corp. v. Carol Publishing Group*, 11 F.Supp.2d 329, 333 (S.D.N.Y.1998). Accordingly, the court must decide whether the instant copying is actionable.[5]

The court finds that *The Wind Done Gone* consists of actionable copying because it is substantially similar to *Gone With the Wind* in both quantitative and qualitative terms. As stated above, to show substantial similarity the plaintiff must demonstrate that the "average lay observer" would recognize that *The Wind Done Gone* has misappropriated copyrighted material from *Gone With the Wind*. *See Herzog*, 193 F.3d at 1248. The court finds that the plaintiff meets this test, because the characters, character traits, scenes,

settings, physical descriptions, and plot are taken directly from *Gone With the Wind*. The new work merely renames some of the characters and settings but otherwise adopts, almost verbatim in many instances, those contained in *Gone With the Wind*. A reasonable person would easily recognize these aspects of the book as having been taken from the well-delineated characters and copyrighted portions of *Gone With the Wind*. *See Paramount Pictures Corp.*, 11 F.Supp.2d at 333; *and see Burroughs v. Metro–Goldwyn–Mayer, Inc.*, 519 F.Supp. 388 (S.D.N.Y.1981) (discussing how well-delineated characters must be to be copyrightable).

Putting aside the plot summaries, verbatim text, and identical scenes, *The Wind Done Gone* also uses the earlier work's main characters and does not make them "flat, one-dimensional characters who are not substantially similar to the characters created by Margaret Mitchell." Defendant's Response at 8 [Doc. No. 11–1]. On the contrary, the book presents the characters as multi-dimensional and necessary participants in *The Wind Done Gone*'s plot. Whether Other as the analog to Scarlett is "the archetypal other person which is, in much conventional literature, the minority race" does not make Scarlett as Other a collinear character but, rather, sews on a new stitch of fabric to the intricate framework of her existing fictional personality. Defendant's Response at 11 [Doc. No. 11–1]. Irrespective of her intent to show the literary "archetypal

---

**5.** "At first glance, it might seem odd to pursue an inquiry as to 'substantial similarity' even after copying as a factual matter has been established. However, the superficial anomaly reflects only a lack of appreciation of the difference between factual copying and actionable copying. The former (probative similarity) requires only the fact that the infringing work copies something from the copyrighted work; the latter (substantial similarity) requires that the copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred." *Ringgold*, 126 F.3d at 75.

'other'" of "the minority race," Ms. Randall has not simply crafted a nameless "other" to demonstrate that from Cynara's perspective Scarlett was an unnoticed and unimportant character. On the contrary, Other's role in *The Wind Done Gone*, just like Scarlett in *Gone With the Wind*, does not cause the reader to ignore her but, rather, demands that the reader pay attention to her and how her life impacts other people around her. Similarly, Rhett Butler as R. is not one-dimensional in the new work but, instead, takes on a major role in Ms. Randall's narrative, just as he did in *Gone With the Wind*. Far from being "flat" and "one-dimensional" R. has a multifaceted character that plays a key role in *The Wind Done Gone*. The fifteen characters at issue are not minor characters in *Gone With the Wind* nor are they in *The Wind Done Gone*. The new work merely adopts the earlier work's descriptions and then adds a few more traits as seen by Cynara. Renaming them Other, R., Planter, Dreamy Gentleman, Mealy Mouth, Miss Priss, Beauty, Lady, Precious, Garlic, Kareen, or Aunt Pattypit, does not aid the defendant's argument as to substantial similarity. *The Wind Done Gone* copies the heart of *Gone With the Wind*'s characters and scenes.

*The Wind Done Gone*'s use of these characters, story lines, detailed descriptions of settings like Tara and Twelve Oaks, which are fictional, not historical, places, constitutes unabated piracy of *Gone With the Wind*. The new work does not simply make general descriptions that passively call attention to the former work; on the contrary, it repeatedly abridges several pages of the lengthy text of *Gone With the Wind* and merely retells the same scene in a single paragraph. The fact that the two works may present polar viewpoints of the same fictional world fails to mitigate the fact that it is the same fictional world, described in the same way and inhabited by the same people, who are doing the same things.

A portion of *The Wind Done Gone*'s manner of infringement is most aptly characterized as fragmented literal similarity. *See Paramount Pictures Corp.*, 11 F.Supp.2d at 333 (explaining that fragmented similarity refers to exact copying of a portion of a work); *and see Ringgold*, 126 F.3d at 75 n. 3. *The Wind Done Gone* satisfies this form of substantial similarity by combining two factors. First, it lifts quotes directly from *Gone With the Wind*. For example the first page of *The Wind Done Gone* states, "She was not beautiful, but men seldom recognized this, caught up in the cloud of commotion and scent in which she moved." Alice Randall, *The Wind Done Gone* at 1. By comparison, the opening line of *Gone With the Wind* states "Scarlett O'Hara was not beautiful, but men seldom realized it when caught by her charm...." Margaret Mitchell, *Gone With the Wind* at 3 (Macmillan Publishing Co.1964) (1936). In fact, throughout its text, *The Wind Done Gone* continually appropriates direct quotes from *Gone With the Wind*. *See generally* Ex. B to Affidavit in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [Doc. No. 5–1]. Secondly, as discussed above, *The Wind Done Gone* uses fictional scenes, characters, plot summaries, and quotes that comprise the heart of *Gone With the Wind*, and does not, as the defendant argues, simply make liberal use of historical facts. Although she researched the antebellum South prior to writing her book, Ms. Mitchell's antebellum world as expressed in *Gone With the Wind* is a work of fiction, which forms the setting for a love story. Though her copying of *Gone With the Wind* may reason-

ably be described as fragmented, Ms. Randall's recitation of so much of the earlier work is overwhelming and constitutes fragmented literal similarity.

■■■■ Moreover, the court finds that *The Wind Done Gone* goes so far in its copying of the plot, scenes, and characters of *Gone With the Wind* as to support a finding of comprehensive nonliteral similarity. *See Twin Peaks Productions, Inc. v. Publications Intern.*, 996 F.2d 1366, 1372–73 (2d Cir.1993) (discussing literal similarity and comprehensive nonliteral similarity between an episode guide book and the television series "Twin Peaks"). The first 100 pages of the work essentially retell the central chapters of *Gone With the Wind*, by reducing them to several pages of text. The detailed recounting of the earlier work's plot consumes the bulk of the first half of the book. While it sets the stage for the later happenings to Cynara, her story is at best only half the novel. The fact that the works are dissimilar in size does not aid the defendant's argument. Simply reducing a chapter to a few pages does not forestall copyright infringement. *See Burroughs v. Metro–Goldwyn–Mayer, Inc.*, 683 F.2d 610 (2d Cir.1982) (recognizing that "copyright infringement may occur by reason of a substantial similarity that involves only a small portion of each work."). In its brief the defendant contends that *The Wind Done Gone* is not substantially similar to *Gone With the Wind* because while there may be some plagiarization of the earlier work, it did not copy all of it. "No copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated." *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir.1992). Thus, where, as here, the court finds substantial similarity, "small changes here and there made by

the copier are unavailing. It is only where the points of dissimilarity exceed those that are similar and those similar are—when compared to the original work—of small import quantitatively or qualitatively that a finding of no infringement is appropriate." *Id.*

The court notes that its finding of fragmented literal similarity and comprehensive nonliteral similarity does not overshadow the court's crucial holding that an average lay observer would recognize *The Wind Done Gone* as having appropriated from *Gone With the Wind.* Accordingly, the court finds as a matter of fact that the substantial similarities between the two works involve actionable copyrightable elements and that an average lay observer or a reasonable juror would find the works substantially similar in expression.

### 2. *Fair Use*

■■■■ Having found that *The Wind Done Gone* is substantially similar to *Gone With the Wind*, the court must next consider the defendant's fair use defense of parody. 17 U.S.C. § 107 provides that "the fair use of a copyrighted work … is not an infringement," thereby limiting the breadth of a copyright owner's exclusive rights. The monopoly that is granted to a copyright owner is not absolute under the Copyright Act, because the law presumes "the author's implied consent to 'reasonable and customary' use," which necessarily is a fair use. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 550, 105 S.Ct. 2218, 2225, 85 L.Ed.2d 588 (1985) (explaining that reasonable use of copyrighted works is deemed to be implied because of "the constitutional policy of promoting the progress of science and the useful arts, since a prohibition of such use would inhibit subsequent writers from attempting to im-

prove upon prior works and thus ... frustrate the very ends sought to be attained.") (citations and internal quotations omitted). Rather than following a bright-line test for whether the use of a work comes under the fair use doctrine, the court, under 17 U.S.C. § 107, must evaluate the record evidence on a "case-by-case" basis. *See Harper & Row*, 471 U.S. at 549, 105 S.Ct. 2218.

▬▬▬ In doing so, the court follows a four factor test included in the Copyright Act:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The court recognizes that this list, however, is not exhaustive. *See Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 448, 104 S.Ct. 774, 792, 78 L.Ed.2d 574 (1984).[6] Because the boundaries of the fair use inquiry are not readily identifiable, various courts have applied different tests and necessarily achieved varied conclusions. Moreover, the court notes:

Because the fair use enquiry often requires close questions of judgment as to the extent of permissible borrowing in cases involving parodies (or other critical works), ... the goals of the copyright law, "to stimulate the creation and publication of edifying matter," ... are not always best served by automatically granting injunctive relief when parodists are found to have gone beyond the bounds of fair use.

*Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 576, 579, 114 S.Ct. 1164, 1171 n. 10, 127 L.Ed.2d 500 (1994); *and see* 17 U.S.C. § 502(a) (the court "may ... grant ... injunctions on such terms as it may deem reasonable to prevent or restrain infringement"). In reaching its conclusion the court "must be alert to the risk of permitting subjective judgments about quality to tilt the scales on which the fair use balance is made." *Twin Peaks Productions*, 996 F.2d at 1374. With the foregoing prescripts in mind, the court addresses whether *The Wind Done Gone* is fair use under the Copyright Act.

#### a. *Purpose and Character of Use*

▬▬▬ Turning to the first factor of "the purpose and character of the use," the court notes that the Supreme Court in *Campbell* unambiguously held that parody,[7] like any other comment or criticism, may claim fair use under 17 U.S.C. § 107. 510 U.S. at 579–82, 114 S.Ct. at 1171–73

---

6. "[T]he endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in the statute. [The Copyright Act] endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in the statute...." *Sony Corp.*, 464 U.S. at 449, 104 S.Ct. at 792 n. 31 (quoting H.R.Rep. No. 94–1476, pp. 65–66, U.S.Code Cong. & Admin.News 1976, pp. 5659, 5680 (1976)); *and*

*see Original Appalachian Artworks, Inc.*, 642 F.Supp. at 1035–36 (discussing the alleged infringer's intent to capitalize on the copyright owner's goodwill); *and see MCA, Inc. v. Wilson*, 677 F.2d 180, 184–85 (2d Cir.1981) (discussing the alleged infringer's lack of intent to parody).

7. Parody or satire is "when one artist, for comic effect or social commentary, closely imitates the style of another artist and in so

(explaining that "parody, like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law"). The critical question in analyzing the first factor is determining whether the secondary work is "transformative." *See id.*, 510 U.S. at 579, 114 S.Ct. at 1170. In weighing all the relevant factors the court, however, notes that a "transformative use is not absolutely necessary for a finding of fair use." *Id.*, 510 U.S. at 579, 114 S.Ct. at 1171. Rather, the Supreme Court has adopted a sliding scale approach with respect to the extent of the parody's critical and transformative elements. *See id.* (explaining that "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use").

### 1. *Transformative Use—Parody*

The "transformative use" concept assists the court in assessing "the value generated by the secondary use and the means by which such value is generated." *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923 (2d Cir.1994). In deciding whether a secondary work is a "transformative use" the Supreme Court has explained that the question for the court is whether such a work "adds something new, with a further purpose or different character." *Campbell*, 510 U.S. at 579, 114 S.Ct. at 1171.

"[P]arody has an obvious claim to transformative value.... Like less ostensibly humorous forms of criticism, it can provide social benefit, by shedding light on an earlier work and, in the process, creating a new one." *Id.* To qualify as a parody, however, "the second work must comment upon or criticize the original copyrighted work," rather than simply satirize it. *Leibovitz v. Paramount Pictures Corp.*, 948 F.Supp. 1214, 1219–20 (S.D.N.Y.1996). "Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing." *Campbell*, 510 U.S. at 580–81, 114 S.Ct. at 1172. Thus, if the infringing work "has no critical bearing on the substance or style of the original composition ... [and] merely uses [it] to get attention to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger." *Id.*

In order to properly analyze the defendant's parody defense, the court must first define it. Then, having determined whether *The Wind Done Gone* is a parody of *Gone With the Wind* under the fair use doctrine, the court can consider that find-

---

doing creates a new art work that makes ridiculous the style and expression of the original." *Rogers v. Koons,* 960 F.2d 301 (explaining that while the sculpture, "String of Puppies," critiques "our materialistic society," it does not critique the infringed photograph "Puppies" itself); *see generally Fisher v. Dees,* 794 F.2d 432 (9th Cir.1986) (finding a parody entitled "When Sonny Sniffs Glue" to be a fair use of the song, "When Sunny Gets Blue"); *Elsmere Music, Inc. v. National Broadcasting Co.,* 482 F.Supp. 741 (S.D.N.Y.),

aff'd, 623 F.2d 252 (2d Cir.1980) (finding "I Love Sodom," a *Saturday Night Live* parody, to be a fair use of "I Love New York"); *Williams v. Columbia Broadcasting Systems, Inc.,* 57 F.Supp.2d 961, (C.D.Cal.1999), *vacated by,* 1999 WL 1260143 (C.D.Cal.) (explaining that use of copyrighted clay figure, "Mr. Bill," by Army soldiers to mock Navy personnel was not a parody because the object of ridicule was not "Mr. Bill," but finding that such use was fair use).

ing in light of other factors, like commercialism. *See Rogers*, 960 F.2d at 309–10 (explaining that courts must first define what is being parodied in order to properly consider a fair use defense).

■ The defendant argues that *The Wind Done Gone* is precisely the type of fair use parody that the Supreme Court contemplated in *Campbell*. According to the defendant, any of the numerous events in *The Wind Done Gone* that "echoes an element" of *Gone With the Wind* does so to make that element appear ridiculous, or to suggest *Gone With the Wind*'s limitations, as understood in the new context. *See* Defendant's Response at 17 (relying upon Sitter Decl. Ex. 1 at ¶ 15)[8] [Doc. No. 11–1]. The new work reverses the stereotypes of the earlier novel and thereby "en-

dows the stereotypical black characters in *Gone With the Wind* with agency, cunning, and effectiveness." Sitter Declaration at ¶ 10. Thus, the defendant concludes that *The Wind Done Gone* mocks and ridicules *Gone With the Wind* and thereby achieves a parodic effect.[9]

Conversely, the plaintiff argues that *The Wind Done Gone* is neither a parody nor a commentary that makes fair use of the copyrighted elements of *Gone With the Wind*.[10] According to the plaintiff, *The Wind Done Gone* does not even attempt to achieve comic effect. Rather, the purpose of putting the key characters of *Gone With the Wind* in new settings is to entertain and sell books to an active and ready-made market for the next *Gone With the Wind* sequel.[11] Moreover, even if Ms. Randall intended the work as a critical commen-

---

8. Professor John E. Sitter is the Charles Howard Candler Professor of English at Emory University.

9. The defendant relies in part on several expert affidavits and declarations, including Professor Henry Louis Gates, Jr., Chair of the Department of Afro–American Studies at Harvard University, who testified: "A parody is a work, belonging to a long literary tradition, which imitates another work and in doing so comments on that work, usually in order to ridicule it or suggest its limitations.... *The Wind Done Gone* is a classic parody, in a long line of literary creations that ... [can] not exist without an extensive evocation of the original. *The Wind Done Gone* does this quite effectively, with carefully selected references to *Gone With the Wind* ...." Gates Decl. Ex. 2 at ¶¶ 4 & 7 [Doc. No. 20–1].

10. Likewise, the plaintiff relies in part on several expert affidavits, including Professor Alan Lelchuk, who teaches the Master of Arts in Liberal Studies at Dartmouth College and testified: The Wind Done Gone "is not satire or parody. The author's claim is proved fallacious by the book itself. There is no consistency here, of style, tone or attitude, to substantiate either form of critical mockery.... Ms. Randall's work is filled with gleanings

and plagiarisms from Gone With the Wind, yet this overwhelming accumulation does not serve the alleged main purpose of the book, namely, a rendering of Gone with the Wind from a black (or ideological) point of view. Actually the reverse is true; the book's mission is continually weakened by the lack of originality in language, in scene making, in character naming or character creation." Lelchuk Aff. Ex. B at ¶¶ 8 & 10 [Doc. No. 21–1].

11. The plaintiff relies in part upon Joel Conarroe, President of the John Simon Guggenheim Memorial Foundation, which awards Guggenheim Fellowships to outstanding writers, who testified: *"The Wind Done Gone* is not parody or satire. It is, rather, an aggregation of characters, themes and languages lifted virtually intact from *Gone With the Wind. The Wind Done Gone* gains such interest as it has from the prestige it borrows from its famous source. Parody is a term that implies wit and humor, neither of which is in evidence here. Rather, the manuscript makes sense *only* by taking Margaret Mitchell's characters and plot and interweaving them through Ms. Randall's book for *dramatic* purposes, not for purposes of parody or commentary." Conarroe Aff. Ex. E at ¶¶ 5 & 7 (emphasis in original) [Doc. No. 21–1].

The plaintiff also relies in part upon Hope Dellon, Executive Editor in the Trade Division

tary on *Gone With the Wind*, the fair price to be paid for the right to publish a sequel to the work has already been set by two publishers who have agreed to pay, or paid, substantial advances and royalties for the right to create its sequels.[12]

Essentially, the defendant counters that *The Wind Done Gone* provides a fresh and unwritten perspective from the same characters in the same scenes but does so to criticize the earlier work's one-sided view, as well as to provide a more complete picture of the antebellum South. Moreover, *The Wind Done Gone* is "an exuberant act of literary revenge" from which black Americans will derive emotional satisfaction, vindication and fun. *See* Mueller Decl. Ex. 6 at ¶ 8 [Doc. No. 20-1]. For example the defendant argues that Garlic, instead of being portrayed as the loyal and obedient slave Pork in *Gone With the Wind*, controls his " 'master' so thoroughly that, when Garlic pulls the strings, the master 'dance[s] like a bandy-legged Irish marionette.' " Defendant's Response at 17–18 [Doc. No. 11–1] (quoting Alice Randall, *The Wind Done Gone* at 63). Whether this achieves a "comic effect" is not the only question. While the scene may be funny, it does not receive the benefit of the

fair use doctrine simply by being so. The key issue is whether its purpose, when written, was to create a comedic scene that demonstrates the irony of the slave controlling his master or rather was created to further elaborate upon an extant character from *Gone With the Wind* in a sequel which only happens to be funny or ironic.

 The court cannot, nor does the law require it to, absolutely discern what Ms. Randall thought as she wrote *The Wind Done Gone*. The court, however, must consider what the author attempts to accomplish by creating her new work through the copying of the original expression of another artist, Ms. Mitchell. *See Rogers*, 960 F.2d at 309–10 (considering the artists' use of the copyrighted work in order to criticize the materialism of society and not to parody the earlier work itself). Moreover, the court must view the work as a whole in comparison to the earlier work and determine what the author likely intended to achieve in creating her new work and whether the work accomplishes this goal. Thus, the inquiry has both subjective and objective elements.

In the "Conversation with Alice Randall" at the end of the book Ms.

---

of St. Martin's Press, LLC, who testified: "From my over twenty-five years of experience in book publishing I know that sequels—and in particular sequels of well-known novels—are regarded as particularly valuable in the industry. There is a strong appetite in the book reading public to know more about characters that have already captured the public's imagination and, consequently, a strong desire on the part of publisher's to fill that appetite. The more well known and beloved a novel is, the greater the interest of both the public and of publishers in a sequel to that novel." Dellon Aff. Ex. A at ¶ 5 [Doc. No. 21–1].

12. "The agreement to publish the second sequel to *Gone with the Wind* specifically provides St. Martin's with protection designed to

prevent any other sequel to *Gone With the Wind* from reaching the public until well after the publication of the St. Martin's book. This protection was a key point of negotiation for St. Martin's because a large part of the appeal, and financial success, of sequels is due to the fact that they satisfy the public's desire to have filled in additional details about the lives of characters they already know. As those details become filled in with each subsequent book, the mystery and suspense that drove the market for those sequels in the first place begin to dissipate. St. Martin's paid well into seven figures for the right to publish the second sequel to *Gone With the Wind*." Dellon Aff. Ex. A at ¶¶ 8 & 9 [Doc. No. 21–1].

Randall provides the following insight into her intentions:

> Q. In some sense, then, are you assuming the role of a revisionist historian, supplying what could have been if *GWTW* were history and not fiction, replacing a part of the story that had been consciously or unconsciously left out or suppressed?
>
> A. Yes. *GWTW*—the book, the movie, the costumes, the quips—has reached the status of myth in our culture. It is more powerful than history, because it is better known than history. Unfortunately, *GWTW* is an inaccurate portrait of Southern history. It's a South without miscegenation, without whippings, without families sold apart, without free blacks striving for their education, without Booker T. Washington and Frederick Douglass. *GWTW* depicts a South that never ever existed.

Even a casual reading of *The Wind Done Gone* illustrates that Ms. Randall has succeeded in including all of these historical elements in her work. The issue, however, is that she does not simply add these historical facts to a new story but, rather, reintroduces these historical elements to an existing story, *Gone With the Wind*, and then retells that story with the same characters, plot and scenes, from the perspective of a person, Cynara, who could appreciate these historical elements. Then, having retold the story of *Gone With the Wind* by repeating famous scenes and liberal use of plot summaries, the author takes Cynara on new adventures with the older works' characters, all of which seems to fit well within the definition of a sequel—"a literary work continuing the course of a narrative begun in a preceding one <the hero performs even more astonishing feats in the [sequel]." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993). Here, the new work does not make use of a hero but, rather, takes fifteen main characters, more fully explains what happen in the previous work, and then tells what happens to them thereafter—a sequel.[13] The fact that the work uses a different writing style does not affect the fact that it tells a story that could serve as a market substitute for a sequel to *Gone With the Wind*.

Ms. Randall explained in her declaration that she had no intention of creating a sequel to *Gone With the Wind*, because doing so, would "endorse the very racial and political views that [she] finds so offensive." Randall Decl. Ex. 5 at ¶ 7 [Doc. No. 20–1]. With respect to her extensive use of copyrighted material, she explains that "there are many aspects of *Gone With the Wind* that [she does] not use in *The Wind Done Gone*." Id. at ¶ 6. The question before the court, however, is plainly not what she refrained from copying but what she copied. Ms. Randall also argues:

> If I had made only one or a few allusions, my literary critique would have been lost. The closest analogy that I can draw is that of propaganda. If I wanted to create a satire of the Soviet Union's claim during the Cold War that all worthy inventions had been created in Russia, I could not single out one

---

13. "[T]he origin of the fair use doctrine is closely connected to abridgments, and early cases went so far as to suggest that an abridgment always constitutes fair use, at least one that is 'a real and fair abridgment' displaying 'the invention, learning, and judgment' of the abridger, and not merely an instance of a work that has been 'colourably shortened.' " *Twin Peaks Productions*, 996 F.2d at 1375 (quoting *Gyles v. Wilcox*, 26 Eng.Rep. 489, 490, 2 Atk. 141, 143 (1740) (No. 130)).

claimed invention for ridicule and be done with it. I would have to create a fuller picture.

*Id.* at ¶ 5(b). This analogy, however, keenly illustrates the difference between parodying the antebellum South by providing a more accurate, non-copyrighted, and historical narrative and using copyrighted material to do so.[14] The treatment of slaves in the antebellum South, like the former Soviet Union's claim, are historical events that have not always been accurately described.[15] Ms. Mitchell's vision of the South is but one fictional encapsulation of that time. Ms. Randall is of course free to create her own. Instead, she has copied Ms. Mitchell's vision, retold *Gone With the Wind*'s story, and then provided a second sequel. Ms. Randall executes her critical but appurtenant work, while simultaneously giving voice to her modern political viewpoints on "current issues, including ... the flying of the Confederate flag and the debate over affirmative action." *Id.* at ¶ 3.

During the hearing on the plaintiff's motion for a TRO, the defendant provided the court with a copy of the recently changed cover of the book, which now explicitly advertises the work as a parody—"A provocative literary parody that explodes the mythology perpetrated by a Southern classic." New Cover to Alice Randall, *The Wind Done Gone.* The inside of the new jacket cover describes the new work as "[a]lluding to events in Mitchell's novel but ingeniously and ironically transforming them...." By contrast, the former cover described the work in a very different light:

In a brilliant rejoinder and an inspired act of literary invention, Alice Randall supplies the story that has been missing from the work that more than any other has defined our image of the antebellum South, Margaret Mitchell's *Gone With the Wind.* Imagine, simply, that the black characters in Mitchell's tale were other than one-dimensional stereotypes. Then imagine, audaciously, that Scarlett O'Hara had an illegitimate mulatto sister, and that this sister, Cynara, Cinnamon, or Cindy—beautiful and brown— gets to tell her story.

---

**14.** "As several serious writers of fiction and non-fiction have shown (for example, Toni Morrison, William Styron and C. Vann Woodward), one can write about the lives of slaves in the United States without reference to Margaret Mitchell's novel, and certainly without appropriating [its] characters, themes, settings, and even [its] language...." Conarroe Aff. Ex. E at ¶ 6 [Doc. No. 21–1].

"Indeed, the continuing appeal of works that revisit the history of slavery like Alex Haley's *Roots*, Toni Morrison's *Beloved*, and August Wilson's *The Piano Lesson*, (all winners of the Pulitzer Prize), Charles Johnson's *Middle Passage* (winner of the National Book Award), Lucille Clifton's *Good Woman*, Octavia Butler's *Kindred*, George Wolfe's *The Colored Museum*, and Sherley Anne Williams' *Dessa Rose* substantiate the fact that racial relationships in the antebellum and postbellum South are still very much a topic of social and political concern." McCaskill Supp.

Decl. Ex. 5 at ¶ 7 [Doc. No. 20–1]. Professor Barbara McCaskill is a professor in the English Department at the University of Georgia, specializing in African American literature.

**15.** The historical period of *The Wind Done Gone* covers "that of *Gone With the Wind* and afterward, continuing through the close of Reconstruction. The dramatic events of the plot of *The Wind Done Gone*, however, do not come from the historical events of the Civil War and Reconstruction eras that figure in *Gone With the Wind* (and numerous other novels); they are derived largely from the fictional plot and character relations created by Margaret Mitchell." Rubin Aff. Ex. C at ¶ 4 [Doc. Nos. 21–1 & 22–1]. Professor Louis D. Rubin, Jr. is the University Distinguished Professor of English Emeritus at the University of North Carolina; Chapel Hill.

Former Cover to Alice Randall, *The Wind Done Gone* (Uncorrected Proof/Advance Reading Copy). If the work is intended to supply the missing story of the earlier work and takes up where the former work left off, then it is a sequel. If the work tells the same story through different eyes, then it infringes on the copyright owner's right to create and control derivative works. In the court's estimation *The Wind Done Gone* achieves exactly what it bills itself as, a sequel to *Gone With the Wind* told from the perspective of Scarlett's mulatto half-sister, Cynara, who gives the reader an abbreviated account of the earlier work from her perspective through plot summaries of the earlier work and by revisiting the most famous scenes as seen or understood by Cynara.

A fair reading of *The Wind Done Gone* yields some parodic elements, such as Planter/Gerald O'Hara being so influenced by Garlic/Pork that he becomes "culturally *African.*" Similarly, the fact that after Mammy was buried, she was dug up and moved so that she was between Planter/Gerald O'Hara and Lady or E/Ellen O'Hara just as she was in life. These descriptions certainly add "new information, new aesthetics, new insights and understandings." Defendant's Response at 16 [Doc. No. 11-1]. Thus, because parody claims "transformative value," the court finds that the new work changes the older work by adding something new "with a further purpose or different character, altering the first [work] with new expression, meaning, or message." *Campbell,*

510 U.S. at 579, 114 S.Ct. at 1171. The degree of that transformation, however, is what is at issue.

■ The work does not, as the defendant argues, wholly change *Gone With the Wind* but, rather, in part repeats the same story as now told by Cynara. While the fact that it is told from someone else's perspective transforms the work, this fact does not necessarily make it a parody. Many of the critical elements of *The Wind Done Gone* attack *Gone With the Wind* but, as explained by Ms. Randall, the new work also seeks to, and does provide, a more balanced view of the antebellum South. This more complete view seeks not only to criticize the older work but also to give the author's social commentary on Southern history and thereby provide a picture of the antebellum South as it existed. The author seeks to criticize the South for its miscegenation, whippings, and selling apart families. Alice Randall, *The Wind Done Gone,* "A Conversation With Alice Randall" at 211. She seeks to demonstrate how the South really existed, with "free blacks striving for their education," with Booker T. Washington and Frederick Douglass. *Id. Gone With the Wind* takes place in the 1860's and 1870's; but, Ms. Randall does not seek to simply criticize the treatment of black Americans in *Gone With the Wind's* fictional time but also to comment upon the treatment of black Americans in the South in the 1930's, 1940's and 1950's as well as today.[16] A parody, however, does not gain protection

---

**16.** *Gone With the Wind* "presented and helped perpetuate an image of the South that I, as an African American woman living in the South, felt compelled to comment upon and criticize.... By presenting an image of blacks as intellectually inferior to whites in the guise of a grand entertainment, the book—and the movie as well—helped convince millions of

Americans that the system under which blacks were denied the vote, shunted to 'separate but equal' schools, and otherwise treated as second-class citizens in the Jim Crow south of the 1930's, 1940's and 1950's was fully justified." Randall Decl. Ex. 5 at ¶¶ 2 & 3 [Doc. No. 20-1].

of the fair use doctrine if it merely uses the protected work as a means to ridicule another object. *See Campbell,* 510 U.S. at 580, 114 S.Ct. at 1172. Here, the parodical work must parody the work itself and not other general concepts and ideas about the way black Americans have been and are treated in the South.

As the defendant's expert, Toni Morrison,[17] queried, "Who controls how history is imagined? Who gets to say what slavery was like for the slaves?" Morrison Decl. Ex. 1 at ¶ 5 [Doc. No. 25–1]. The answer to that question is of course anyone who chooses to write about historical events, whether as history or fiction. The question before the court is not who gets to write history, but rather whether Ms. Randall can permeate most of her new critical work with the copyrighted characters, plot, and scenes from *Gone With the Wind* in order to correct the "pain, humiliation and outrage" of the "a-historical representation" of the previous work, while simultaneously criticizing the antebellum and more recent South. *Id.* Parody has its place in copyright law, but the extent of the use of the copyrighted work and the purpose of the author's prose may limit the parodical effect and nullify the fair use defense.

Based on the foregoing analysis, the court concludes that while *The Wind Done Gone* in part criticizes *Gone With the Wind,* the book's overall purpose is to create a sequel to the older work and provide Ms. Randall's social commentary on the antebellum South. The work retells the earlier story in a condensed version from a different perspective but, in truth, merely encapsulates the same story while adding new twists. Because, however, the structure and style of the new work differ dramatically from the epic qualities of *Gone With the Wind,* the court finds that the work is, at least in part, transformative. The new work takes its new character Cynara on new adventures and creates new scenes with the older work's characters, while it also revisits the older work's scenes. Thus, the court finds that *The Wind Done Gone* contains transformative parody that criticizes the earlier work and the antebellum South in general. As much as the work transforms the earlier work, it does so no more than any other sequel to an original work. "[A] work composed primarily of an original, particularly its heart, with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original." *Campbell,* 510 U.S. at 588–89, 114 S.Ct. at 1176. Accordingly, the court must consider the extent of the transformative and superseding use in light of each other as well as the remaining factors.

### 2. *Commercial Purpose*

█ The parties make various assertions as to the import, or the lack thereof, of the commercial use factor. The court understands that "unduly emphasizing the commercial motivation of a copier will lead to an overly restrictive view of fair use." *American Geophysical Union,* 60 F.3d at 921 (citing *Campbell,* 510 U.S. at 585, 114 S.Ct. at 1174); *see also Maxtone–Graham v. Burtchaell,* 803 F.2d 1253, 1262 (2d Cir. 1986). "If, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the

---

**17.** Professor Morrison is the Nobel Prize-winning author of seven novels and the Robert Goheen Professor at Princeton University.

preamble paragraph of § 107...." *Campbell,* 510 U.S. at 585, 114 S.Ct. at 1174. Moreover, the copyright laws were not intended to provide a copyright owner with an absolute and unqualified monetary return on his work, but rather "to secure a fair return for an author's creative labor" and ultimately to stimulate "artistic creativity." *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 527, 114 S.Ct. 1023, 1029, 127 L.Ed.2d 455 (1994); *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975); *and see Harper & Row,* 471 U.S. at 546, 105 S.Ct. at 2223 (explaining that a "fair return" is all that is intended by the Copyright Act).

■ Notwithstanding the foregoing, the court does not believe that the limit of what is a "fair return" should be an arbitrary number arithmetically determined by the court, nor should it ignore the commercial use factor simply because the copyright owner is maximizing the profit potential of her work. Under the copyright laws, the court is not required to forge an arbitrary numerical cut-off for a copyright owner's economic gain nor the potential gain of the alleged infringer in order to consider the commercial use element. Rather, and more simply, the court in weighing the commercial character of a secondary work under the fair use defense should not rely too heavily on the value that is potentially obtained by the use of the copyrighted material. *See Rogers,* 960 F.2d at 309 (discussing the commercial/public benefit distinction in copying). This analytical constraint, however, does not prohibit the court from recognizing and then preventing commercial exploitation of a copyrighted work in a manner that directly acquires financial rewards from its use of the copyrighted material. *See American Geophysical Union,* 60 F.3d at 922 (discussing economic benefits derived directly and exclusively from the copyrighted work). Thus, the court must strive to achieve a "sensitive balancing of interests" that considers not only the defendant's obvious commercial use of *Gone With the Wind* but also preserves Congress' intent to have courts consider "the breadth of their traditionally ample view of the universe of relevant evidence." *Campbell,* 510 U.S. at 584–85, 114 S.Ct. at 1174 (citing *Harper & Row,* 471 U.S. at 561, 105 S.Ct. at 2230).

■ The court finds that *The Wind Done Gone* is unquestionably a fictional work that has an overarching economic purpose. *See generally Sandoval v. New Line Cinema Corp.,* 973 F.Supp. 409, 413 (S.D.N.Y.1997) (discussing commercial purpose and transformative use). While the commercial purpose of *The Wind Done Gone* weighs strongly in favor of the plaintiff on the first factor, the transformative nature of the use of *Gone With the Wind* means that the commercial purpose will not receive undue weight in the overall fair use analysis. *See generally Campbell,* 510 U.S. at 579, 114 S.Ct. at 1171 (discussing transformative use of earlier work in consideration of other factors).

b. *Nature of the Copyrighted Work*

■ The next fair use factor concerns the nature of the work that has been copied. If the original work is factual in nature as opposed to fictional, then the scope of permissible fair use is much broader. *See Rogers,* 960 F.2d at 310. By contrast, where a copyrighted work is one of fiction or fancy, it deserves greater protection under a fair use analysis than would a factual work. *See Stewart v. Abend,* 495 U.S. 207, 237, 110 S.Ct. 1750, 1769, 109 L.Ed.2d 184 (1990). In consider-

ing the original work, the court should also consider whether it is creative, imaginative, and represents an investment of time in anticipation of a financial return. *See MCA, Inc. v. Wilson,* 677 F.2d at 182.

■ *Gone With the Wind* is certainly a work of fiction that is creative, imaginative, and written to gain a financial return for the author's efforts. Therefore, it deserves more protection than a scholarly, historical, or newsworthy work. *See e.g. Stewart,* 495 U.S. at 237, 110 S.Ct. at 1769 (giving greater protection to a comic book story which was the basis of the movie "Rear Window"); *and see Harper & Row,* 471 U.S. at 563, 105 S.Ct. at 2232 (affording lesser protection to the autobiographical memoirs of President Gerald Ford). Accordingly, the court concludes that this factor militates against a finding of fair use.

### c. *Amount and Substantiality of Work Used*

■ In considering the third factor under Section 107, the court must take into account the quantity and value of the material used in relation to the work as a whole. *See Campbell,* 510 U.S. at 586–87, 114 S.Ct. at 1175. Moreover, the court looks "to the persuasiveness of a parodist's justification for the particular copying done, and the enquiry will harken back to the first of the statutory factors," because "the extent of permissible copying varies with the purpose and character of the use." *Id.* (citing *Sony Corp.,* 464 U.S. at 449–50, 104 S.Ct. at 792–93).

■ Because the defendant argues that the entire work, *The Wind Done Gone,* is a parody, the court must analyze the third factor in light of the Supreme Court's instructions on evaluating parodic copyright infringement.

Parody presents a difficult case. Parody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through distorted imitation. Its art lies in the tension between a known original and its parodic twin. When parody takes aim at a particular original work, the parody must be able to "conjure up" at least enough of that original to make the object of its critical wit recognizable.... What makes for this recognition is quotation of the original's most distinctive or memorable features, which the parodist can be sure the audience will know. Once enough has been taken to assure identification, how much more is reasonable will depend, say, on the extent to which the song's overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original. But using some characteristic features cannot be avoided.... This is not, of course, to say that anyone who calls himself a parodist can skim the cream and get away scot free.

*Campbell,* 510 U.S. at 589–90, 114 S.Ct. at 1176 (internal citations omitted) (explaining that 2 Live Crew's copying of the heart of the original song did not become excessive merely because the portion taken was the original's heart). Thus, the question of fairness requires the court to determine "what else the parodist did besides go to the heart of the original," as well as consider the necessity of using the material in relation to its parodic purpose. *Id.*

If *The Wind Done Gone,* as the defendant contends, is intended to shed light upon and correct the "inaccurate portrait of Southern history" contained in *Gone With the Wind,* then the court finds that *The Wind Done Gone* uses too much copy-

righted material in doing so. What Ms. Randall has lifted from *Gone With the Wind* is plainly substantial in relation to the copyrighted work as a whole. In its brief the defendant argues that under *Campbell* even if the court finds that *The Wind Done Gone* copies more of the original work than is necessary to conjure up the earlier work, this will not necessarily tip the third factor against a finding of fair use. 510 U.S. at 588, 114 S.Ct. at 1176. Thus, the defendant contends that even if the court finds that Ms. Randall copied protectable material from *Gone With the Wind*, her use was not excessive in relation to her parodic purpose and was, therefore, fair. The court disagrees.

Ms. Randall's use cannot receive the benefit of the fair use defense because she uses far more of the original than necessary. Her use does not merely "conjure up" the earlier work, but rather has made a wholesale encapsulation of the earlier work, copied its most famous and compelling fictional scenes, and appropriated its copyrighted and most notable characters. Her use of the copyrighted material merely summarizes most of the earlier work without any commentary or fresh ideas that challenge the reader's understanding of the earlier work. While the new work adds some new creative elements to the original story, those elements only decorate and do not develop something new except to form a sequel.

More critically, it is not just the quantity of the work used, which is, as stated above, quite substantial but, rather, the qualitative degree of the copying. As explained in the substantial similarity discussion above, the work includes the original work's plot, themes, characters, character traits, settings, scenes, descriptive phrases, and verbatim quotes. *See generally*

*Campbell,* 510 U.S. at 588–89, 114 S.Ct. at 1175–76 (explaining that copying verbatim is relevant because it "may reveal a dearth of transformative character or purpose under the first factor, or a greater likelihood of market harm under the fourth"). The court appreciates a parody's need to copy the recognizable material of the earlier work to alert the reader to its parodic intent. *The Wind Done Gone,* however, could have copied significantly less of the memorable parts of the original, and its parodic character "would have come through." *Id.* (citations omitted).

Having compared the new work to the old and balanced that use against Ms. Randall's need to give her work its intended parodic character, the court finds that *The Wind Done Gone*'s use of copyrighted material from *Gone With the Wind* goes well beyond that which is necessary to parody it. The use of so much material removes the new work from the safe harbor of parody and, as written, becomes piracy. Accordingly, the court finds that the third factor militates against a finding of fair use.

### d. *Effect of the Use on the Market Value of the Original*

■ The fourth factor is largely addressed by the third factor, which reveals the degree "to which the parody may serve as a market substitute for the original or potentially licensed derivatives." *Campbell,* 510 U.S. at 588, 114 S.Ct. at 1175 (citations omitted); *and see Harper & Row,* 471 U.S. at 568, 105 S.Ct. at 2234 (explaining that the court's inquiry must also take into account the harm to the market for derivative works). This factor is arguably the most important of the four factors of the fair use doctrine. *See Sandoval,* 973 F.Supp. at 414 (citing *Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233

**1382**

(this factor is "undoubtedly the single most important element of fair use")); *but see Campbell*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (omitting that this factor is the most important element). Importantly, in considering this factor, the court must look not only at the extent of the new work's potential market harm to the earlier work but also look to "the effect that would occur if that type of use became widespread." *Id.*

 Since 1936, Ms. Mitchell or her heirs have authorized, produced, and published derivative works, including films, *Scarlett: The Sequel,* and the Second Sequel. All of these derivative works have generated millions of dollars for the Mitchell Trusts. If the defendant is permitted to publish *The Wind Done Gone,* an unauthorized derivative work, then anyone could tell the love story of *Gone With the Wind* from another point of view and/or create sequels or prequels populated by Ms. Mitchell's copyrighted characters without compensation to the Mitchell Trusts.[18] It is precisely the kind of work that the copyright laws prohibit. Moreover, by killing two core characters from *Gone With the Wind* and marrying off another, *The Wind Done Gone* has the immediate effect of damaging or even precluding the Mitchell Trusts' ability to continue to tell the love story of Scarlett and Rhett.[19]

 Relying chiefly upon *Campbell,* the defendant argues that *The Wind Done Gone* is criticism. Therefore, the defendant concludes, there is no market harm to the plaintiff's derivative use market, because the plaintiff will never license a "stinging" critique of *Gone With the Wind. See* Defendant's Response at 20 [Doc. No. 11–1]. The court recognizes that "[t]he market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." *Campbell,* 510 U.S. at 593, 114 S.Ct. at 1178. The issue is whether the defendant's secondary use affects any aspect of the normal market for the copyrighted work. *See American Geophysical Union,* 60 F.3d at 930. "If a parody whose wide dissemination in the market runs the risk of serving as a substitute for the original or licensed derivatives ..., it is more incumbent on one claiming fair use to establish the extent of transformation and the parody's critical relationship to the original." *Campbell,* 510 U.S. at 581 n. 14, 114 S.Ct. at 1172 n. 14. While much of the new work is transformative of the earlier work, as explained above, it borrows extensively from the original and may likely have enormous distribution in the market.[20] Moreover, the plaintiff's contract for the Second Sequel is expected to tell Rhett's story. A story that Ms. Randall attempts to largely tell in *The Wind Done*

---

**18.** "If, therefore, the use of *Gone With the Wind* in [*The Wind Done Gone* ] were conceded, then the right of copyright would be rendered meaningless, because the characters, plot and setting of any work of fiction that attained popularity would be eligible for representation for other would-be novelists to use." Rubin Aff. Ex. C at ¶ 13 [Doc. No. 21–1].

**19.** "With computerized sales tracking, stock levels and placement of books by distributors and retailers are dictated by the most recent title's sales performance which directly influences expectations for the next title in a ser-

ies, or for newer books by the same author. A weaker offering or one that fails to perform up to the sales standard previously set usually results in reduced expectations from booksellers and therefore reduced distribution and representation for subsequent titles." Holtz Aff. Ex. D at ¶ 4 [Doc. No. 21–1]. Alex Holtz is the President of Holtz Associates, which engages in literary consulting for publishers.

**20.** The court notes that the defendant already has an extensive publication schedule for the book—"6–City author tour, including: NYC, L.A., Boston, Philadelphia. National print

*Gone.* Thus, the court must strike a balance "between the benefit gained by the copyright owner when copying is found [to be] an unfair use and the benefit gained by the public when the use is held to be fair. The less adverse impact on the owner, the less public benefit need be shown" to overcome its commercial effect. *Rogers,* 960 F.2d at 311–12.

Here, the court does not presume nor infer market harm, because the transformative use of *Gone With the Wind* makes market substitution at least less certain. *See Campbell,* 510 U.S. at 592, 114 S.Ct. at 1177. "Indeed, as to parody pure and simple, it is more likely that the new work will not affect the market for the original in a way cognizable under this factor, that is, by acting as a substitute for it." *Id.* As explained·above, however, the transformative use at issue here is not "parody pure and simple" but, rather, some parody coupled with extensive duplication of the original. The new work is distinguishable from pure parody, because it does not simply engage in "[b]iting criticism" that may or may not suppress demand for the original but, instead, usurps the original's right to create its own sequel. *Id.,* 510 U.S. at 593–94, 114 S.Ct. at 1178. In this sort of case, where the later work has a more complex character which affects not only the arena of criticism but also the protectable markets for derivative works, the court "looks beyond the criticisms to the other elements of the work." *Id.* The Supreme Court recognized the difficulty of this inquiry, explaining:

> [I]t may be difficult to determine whence the harm flows. In such cases,

the other fair use factors may provide some indicia of the likely source of the harm. A work whose overriding purpose and character is parodic and whose borrowing is slight in relation to its parody will be far less likely to cause cognizable harm than a work with little parodic content and much copying.

*Id.,* 510 U.S. at 594 n. 24, 114 S.Ct. at 1178 n. 24. As explained above, the parodic intent may be substantial; the parodic effect, however, is slight in comparison to the extensive copying. Accordingly, the court finds that the market harm created by *The Wind Done Gone* is not due to the "effectiveness of its critical commentary" but rather to its "market substitution" as a sequel. The evidence of substantial harm to the plaintiff weighs against a finding of fair use, because the licensing, creation, and control over derivative uses is an important economic incentive to the creation of the original. *See Id.,* 510 U.S. at 594, 114 S.Ct. at 1178. The court finds that the instant harm of market substitution weighs against a finding of fair use under the fourth factor.

■ The statutory factors provide only a nonexclusive guide for the court to analyze the fair use defense. *See Harper & Row,* 471 U.S. at 560, 105 S.Ct. at 2230. The court has considered not only the enumerated factors but also the intrinsic equitable considerations raised in each party's brief and during oral argument. Based on the foregoing analysis and having weighed the above factors and the relevant equitable considerations, the court finds that the plaintiff has a substantial

summer reading advertising: *New York Times Book Review, Black Issues Book Review.* Radio satellite tour supported by on-air giveaways. Southern saturation tour: Washington, D.C., Nashville, Lexington, Ky., Atlanta, Oxford, Miss. Internet Campaign coordinated

by Web specialist. Houghton Hand–Sell: *Houghton Mifflin Sampler* (June)" Back Cover of Alice Randall, *The Wind Done Gone* (Houghton Mifflin Company 2001) (Uncorrected Proof/Advance Reading Copy).

likelihood of succeeding on the merits of its claim of copyright infringement.

## B. *Irreparable Injury*

■ Generally, once a plaintiff has made out a prima facie showing of infringement, irreparable harm may be presumed. *See Sony Corp.*, 464 U.S. at 451–52, 104 S.Ct. at 793. The burden then shifts to the defendant to rebut this presumption. In this case, the defendant has failed to do so. The defendant argues that any effect on the plaintiff could be quantified in terms of lost sales, including future sales, of *Gone With the Wind* and related works. The court is unpersuaded by this rationale. Allowing the defendant to prevail on this basis would, "in effect, make any copyright holder an involuntary licensor of the copyright to any entity that could be relied on to pay damages." *Paramount Pictures Corp.*, 11 F. Supp.2d at 338 (citations omitted). Such a policy would undoubtedly weaken the integrity of a copyrighted work. *See id.* Thus, the plaintiff has the presumption of irreparable harm, and the defendant has failed to rebut it. Accordingly, the court finds that the plaintiff has made a sufficient showing of irreparable harm.

## C. *Balance of Harm*

■ The third requirement for injunctive relief necessitates the court's finding that the threatened injury to the plaintiff outweighs whatever damage the proposed injunction might cause the defendant. The defendant argues that it will suffer irreparable and lasting harm if the court enjoins the publication of *The Wind Done Gone*. It contends that it relies heavily on the publication of important literary works to enhance the overall reputation and goodwill of the company as a whole. The disruption to its publication schedule for *The Wind Done Gone* would affect the publication dates of its other books. While the parties dispute whether publishers, like the defendant, regularly change the publication dates of their books, the court finds that the defendant has articulated a cognizable injury. In considering the relevant harms to the parties, however, the court finds that the plaintiff's potential injuries far outweigh the harm to the defendant. If the ultimate finding of the court is that the defendant has infringed on the plaintiff's copyright, its failure to enjoin the defendant from wide dissemination of the infringing work now would likely prevent the court from providing adequate relief in the future. Furthermore, the court finds that the magnitude of the plaintiff's potential damage is far greater than the damage that an injunction will cause the defendant.

## D. *Public Interest*

■ It is well-established in the Eleventh Circuit that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion'" as to the four requirements. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306–07 (11th Cir.1998). When the reader of *Gone With the Wind* turns over the last page, he may well wonder what becomes of Ms. Mitchell's beloved characters and their romantic, but tragic, world. Ms. Randall has offered her vision of how to answer those unanswered questions, albeit with a partially parodic purpose in mind. The right to answer those questions and to write a sequel or other derivative work, however, legally belongs to Ms. Mitchell's heirs, not Ms. Randall.

■ The defendant argues that the First Amendment must be the court's chief

concern. With respect to copyright protection, however, the First Amendment does not license an infringing author to trample on legally recognized rights. *See In re Capital Cities/ABC, Inc.,* 918 F.2d 140, 143–44 (11th Cir.1990). The Copyright Act clearly contemplates injunctive relief to prevent infringement.[21] The competing public interests of access to Ms. Randall's work and preserving a copyright holder's ownership interests, on balance, favor preserving the plaintiff's copyright interests.

### III. *FINDINGS OF FACT*

Based on the record evidence, the court reiterates the following critical findings of fact:

1. The Mitchell Trusts have a valid, existing copyright in the novel *Gone With the Wind* by Margaret Mitchell and its derivative works.

2. Houghton–Mifflin Company is offering for sale the book *The Wind Done Gone* by Alice Randall sometime in the next eight weeks.

3. Ms. Randall had access to *Gone With the Wind* when she wrote *The Wind Done Gone.*

4. There are substantial similarities, objectively and subjectively, between the two books; that an average lay observer or a reasonable juror would find the works substantially similar in expression; and that those similarities involve copyrighted material.

5. On the question of parody and fair use, while *The Wind Done Gone* in part criticizes and satirizes *Gone With the Wind* and is partly transformative, its overall purpose and effect is to create a sequel to the older work.

6. *The Wind Done Gone* is a new fictional work that has an overarching economic purpose.

7. *Gone With the Wind* is an original work of fiction that was written to gain a financial return for the author's efforts.

8. The new work's use of copyrighted materials from *Gone With the Wind* goes well beyond that which is necessary to create a parody and, thus, makes excessive use of the original work.

9. The new work would serve as a market substitute for a potentially licensed derivative work. Further, there is great potential market harm

**21.** Injunctive relief may be freely granted by the courts in order to prevent infringement of a copyright. *See generally Salinger v. Random House, Inc.,* 811 F.2d 90 (2d Cir.1987) (appellate court directed district court to issue a preliminary injunction restraining defendant from publishing a biography of J.D. Salinger which copied his protected expression); *Gilliam v. American Broadcasting Companies, Inc.,* 538 F.2d 14 (2d Cir.1976) (appellate court directed district court to enter preliminary injunction to prevent ABC from broadcasting Monty Python program in unauthorized, edited form); *Universal City Studios, Inc. v. Film Ventures Intern., Inc.,* 543 F.Supp. 1134 (C.D.Cal.1982) (preliminary injunction granted against owners of the movie "Great White," because it was substantially similar to "Jaws"); *Metro–Goldwyn–Mayer, Inc.,* 479 F.Supp. 351 (enjoining performance of a musical production similar to *Gone With the Wind* ); *Douglas Intern. Corp. v. Baker,* 335 F.Supp. 282 (S.D.N.Y.1971) (enjoining production of a stage play concerning the life of Lenny Bruce); *Marvin Worth Productions v. Superior Films, Corp.,* 319 F.Supp. 1269 (S.D.N.Y.1970) (enjoining distribution or exhibition of a biographical film concerning Lenny Bruce which infringed copyrighted materials).

created by the new work because of its market substitution as a sequel.

10. Any harm to the defendant in delaying the publication of the new work is outweighed by the potential harm to the plaintiff in ways that would be difficult, if not impossible, to compensate or calculate in terms of money damages.

11. The issuance of an injunction is not adverse to the public interest.

## IV. *CONCLUSION*

Based on the court's factual findings and conclusions of law, the court finds that the defendant's publication and sale of *The Wind Done Gone* will infringe the plaintiff's copyright interests as protected under the copyright laws. Accordingly, the court hereby GRANTS the plaintiff's motion for a preliminary injunction [Doc. No. 5–2].

Pending further order by the court, the defendant is hereby PRELIMINARILY ENJOINED from further production, display, distribution, advertising, sale, or offer for sale of the book *The Wind Done Gone*.

Pursuant to FED.R.CIV.P. 65(c), this order is effective upon the plaintiff's posting a bond in the amount of $250,000.